No. 53,420

David Baker, by and through his conservator, Ira Dennis Hawver, *Plaintiff,* v. City of Topeka, Kansas, *Defendant-Appellant,* and The Kansas Power and Light Company, *Defendant-Appellee,* and Eagle Signal Corporation; Gades Sales Company, Inc.; E. W. Bliss Company; Gulf & Western Industries Company; Gulf & Western Mfg. Co.; Eagle Signal Americas Corporation; Eagle Signal Mfg. Corp.; Paramount International Holding Company; State of Kansas; John B. Kemp, Secretary of Transportation of the State of Kansas; Mark Meier; Robert Lee Burkhardt; and Colleen M. Chisham, *Defendants.*

(644 P.2d 441)

Opinion filed May 8, 1982.

*Robert E. Duncan, II,* assistant city attorney, argued the cause and was on the brief for appellant, City of Topeka.

*Robert D. Ochs,* of Fisher, Ochs and Heck, P.A., of Topeka, argued the cause and *Ann L. Hoover,* of the same firm, was with him on the brief for appellee, Kansas Power & Light Co.

The opinion of the court was delivered by

HOLMES, J.: The City of Topeka, a defendant in a comparative negligence action, appeals from an order dismissing its cross-claim against Kansas Power and Light Company (KP&L), a codefendant. Both parties, along with several other defendants, settled with the plaintiff and he, along with the other defendants, are not parties to this appeal.

On September 26, 1977, at approximately 6:45 a.m., plaintiff David Baker was proceeding south on Topeka Boulevard in Topeka when he was involved in a collision which has left him incapacitated. The collision involved the motorcycle ridden by Baker and an automobile driven by Coleen Chisham, and occurred at the intersection of Topeka Boulevard and Croix Street.

The intersection is supposed to be controlled by an automatic traffic signal. On the morning of the accident, however, the signal was malfunctioning. As Baker approached the intersection he faced a steady green signal. Ms. Chisham, on Croix Street, was becoming impatient on her way to work because she had waited an unusually long time at a steady red light. Believing the lights to be malfunctioning, Ms. Chisham proceeded through the intersection against the red signal, whereupon her automobile collided with Baker's motorcycle.

About one-half hour before the accident occurred, a Shawnee County Sheriff's Deputy had gone through the intersection and had reported to his dispatcher that the traffic lights were cycling unusually fast. Since traffic was light at the time, he did not feel the situation required him to stop and direct traffic.

About fifteen or twenty minutes before the accident, a Topeka Police Officer, Robert Lee Burkhardt, went through the intersection in his private automobile. On his way home after finishing his shift, Officer Burkhardt observed the signal at the intersection was stuck and noticed some traffic congestion. Since he was off-duty and had no emergency equipment or two-way radio in his car, he did not stop to direct traffic. When he reached home, he telephoned the Topeka Police Dispatcher to report the stuck signal.

About eight minutes before the accident, Topeka Police Officer Mark W. Meier also proceeded through the intersection. He was heading for the station house to conclude his tour of duty which, technically, had already ended. After sitting on Croix Street at the

red signal for approximately three minutes, Officer Meier determined that the light was stuck. He decided there was no hazard and that he did not need to stay there and direct traffic. He proceeded through the red light onto Topeka Boulevard toward downtown, reporting the stuck signal by radio to his dispatcher, Randy Carver.

The dispatcher contacted KP&L, informed them of the malfunction and requested repairs. He was advised it could take as much as one hour for the repairman to get to the intersection. Dispatcher Carver did not deploy any Topeka police officers to the intersection to direct traffic pending the arrival of KP&L's repairman. Shortly thereafter he was informed by the Shawnee County Sheriff's office that the Baker-Chisham traffic accident had occurred.

Seeking redress for the serious personal injuries he sustained, plaintiff, by his conservator, filed claims for damages against numerous defendants including the City, KP&L, Ms. Chisham, Officers Meier and Burkhardt, the signal light manufacturer and its parent companies, the distributor, the State of Kansas, and the Kansas Secretary of Transportation. Then, among the defendant parties, various cross-claims were filed seeking indemnification for damages which plaintiff might recover against the cross-claimant. Eventually, all of the defendants either settled with the plaintiff or were dismissed from the lawsuit. The settlement totaled $1,175,500.00, of which KP&L paid $675,000.00 and the City $178,000.00. The settlements negotiated by KP&L and the City were for the negligence and liability of each defendant only and in each release executed on behalf of plaintiff, he reserved the right to pursue his claims against the remaining defendants. In addition, in the settlement agreement executed by plaintiff and the City, the City reserved the right to pursue its cross-claim against KP&L. KP&L was not a party to the City's release and had no part in the settlement negotiated between plaintiff and the City. The City had filed a cross-claim against KP&L seeking indemnity for any amounts it might ultimately have to pay the plaintiff but after all the defendants had settled, individually, with plaintiff or been otherwise dismissed from the action, the court dismissed plaintiff's case with prejudice as to all defendants and terminated the litigation. The City has appealed, asserting it has a right to indemnification from KP&L based upon an express

written contract or, in the alternative, on common law principles of indemnity.

On the 5th of June, 1962, the City of Topeka and KP&L entered into an express contract, adopted as City Ordinance No. 10646, whereby the City agreed to purchase from KP&L its requirements for street and alley lighting, and the operation and maintenance of traffic and school signal lights, including the signal light located at the intersection of Topeka Boulevard and Croix Street. The pertinent portions of the contract provide:

"3. The Company shall operate the above lighting facilities and signal systems according to the scheduled hours of burning, and shall maintain the same. . . . Traffic signal lights shall be operated twenty-four (24) hours each day or upon such reduced schedule as may be designated by the City.

. . . .

"6. The Company shall use reasonable diligence to provide regular and constant service according to schedule, but does not guarantee that the service will at all scheduled times be continuous. In case Company is unable to render or is prevented from rendering continuous service by accidents, suspension or interruption of transportation facilities, fires, explosions, cyclones, tornadoes, floods, earthquakes or other revulsions of nature, strikes, lockouts, or other cessation of work by operating personnel, picketing, riots, war, insurrection, inability to procure cars, fuel, or other material or commodity necessary for the delivery of such lighting service, federal, state or other governmental laws or regulations, or other contingencies beyond its control, Company shall not be obligated to render street lighting, traffic signal lighting or school signal lighting service during such period, and shall not be liable to City for any damages in the premises. Nothing herein contained shall be construed as permitting City to refuse the said service as soon as the cause of interruption is removed.

. . . .

"8. The Company in the construction, maintenance and operation of the facilities provided for herein shall use reasonable care to avoid damage or injury to persons or property and shall save and hold harmless the City of and from any and all damages, injuries and expenses caused by the negligence of the Company, its agents or employees, or by reason of the failure of the Company to comply with the provisions of this agreement."

By its terms, the express contract was for a ten-year period from the date of its execution. Although the contract term expired in 1972, some five years before the traffic accident, KP&L and the City continued to perform in the same manner as they had under the written contract. Services were performed and bills were paid by the respective parties even though no memorial of their agreement was redrafted and no new ordinance was adopted. It is the City's contention that the original contract has been extended as to all its terms by the actions of the parties, while KP&L

acknowledges that there is some sort of an informal agreement or understanding but that the indemnity provision is no part of whatever arrangement may exist. It appears that KP&L has performed its duties in the same manner as it did during the ten-year term of the contract and the City has been paying for services in the same manner as under the written agreement, including periodic increases in the amounts paid when the same are authorized by the Kansas Corporation Commission.

At the outset it should be pointed out that the settlements made by the City and KP&L were for the individual liability, or fault or negligence of each party and in no way purported to be a settlement of all plaintiff's claims or of any claims other than the claim of plaintiff against each defendant separately. In other words, KP&L settled with the plaintiff for its negligence only and the City settled with the plaintiff for its negligence only. In this respect this case differs considerably from *Ellis v. Union Pacific R.R. Co.,* 231 Kan. 182, 643 P.2d 158 (1982), and *Kennedy v. City of Sawyer,* 228 Kan. 439, 618 P.2d 788 (1980).

Did the contract or franchise between the City and KP&L continue after its expiration date in 1972? We think so.

Generally, upon the expiration of a municipal franchise granted to a public utility there is no longer any contractual relationship between the municipality and the utility. 36 Am. Jur. 2d, *Franchises* §59, p. 788. The exception to this general rule occurs, however, when the parties to the franchise agreement continue to perform after the expiration of the franchise in the same manner as they did when the franchise was still formally in effect. A number of cases to this effect are summarized in 17 Am. Jur. 2d, *Contracts* §520, p. 1007, as follows:

"The doctrine has been advanced that where an agreement expires by its terms, and, without more, the parties continue to perform as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old; and ordinarily the existence of such a contract is determined by the 'objective' test, that is, whether a reasonable man would think the parties intended to make such a new binding agreement."

A number of decisions have applied this principle to contractual relationships existing between municipalities and franchisees, when both continue to accept benefits and burdens of the franchise after the term of the franchise has expired. In *Incorporated Town of Pittsburg v. Cochrane,* 195 Okla. 593, 159 P.2d 534 (1945), the plaintiff was a holder of a franchise granted by a

city under which the franchise holder was to furnish water and lights to the inhabitants of the town for a period of twenty years. After the expiration of the twenty-year term, neither party did anything to continue or discontinue their relationship. The utility continued to furnish water and lights and the town inhabitants continued to pay for such services. The utility defaulted on its taxes, and Cochrane acquired the utility's property at a sheriff's sale. The city brought an action to enjoin Cochrane from removing the assets of the utility. The court held that Cochrane acquired no greater rights than the original franchise holder, and that the utility's assets could not be removed without first giving the town reasonable notice in which to obtain a new water system. The court stated in effect that the contractual relationship that existed prior to the expiration of the express franchise continued on the same terms and conditions after the date of expiration and said:

"If after termination of the franchise the company continues to furnish and the town accepts the service, an implied contract of indefinite duration arises and the company functions as a quasi-public utility *subject to the terms of the former franchise* and the rules and regulations of the Corporation Commission. Such arrangement may be terminated by either party by the giving of such reasonable notice as would be consistent with the duty owed by both to the inhabitants of the town. See Ann. 112 A.L.R. 635, 43 Am. Jur. sec. 79, page 622." pp. 596-597. (Emphasis added.)

In *Bowers v. Public Service Co.*, 328 Mo. 770, 41 S.W.2d 810 (1931), the Missouri Supreme Court was faced with an expired franchise agreement between Kansas City, Kansas, and the Kansas City Railways Company. The court held that despite the expressed term of the agreement, a twenty-year period, the obligation created under the contract remained valid after the expiration of the term where the benefits were still derived:

"In other words, they acted as though the franchise was still in existence, and for that reason they should not be heard to say that they were not exercising it. Since the receivers treated the franchise as a live instrument, acted thereunder and received its benefits, they should not be permitted to avoid the obligations it created." p. 775.

KP&L, on the other hand, asserts that the indemnity clause of the agreement was dropped and relies upon cases and authorities which require that indemnity agreements which are exculpatory in nature should be strictly construed. However, in the cases cited by KP&L the factual situations did not involve the continued

performance of the parties under an agreement in which the term had expired. We do not believe that KP&L could continue to reap the benefits of the 1962 agreement after its expiration in 1972 yet be relieved of the burdens of the same agreement. We hold that the parties by their actions and performance continued the terms of the 1962 agreement past the expiration date.

Having determined that the terms of the 1962 agreement continued, is the City entitled under those terms to indemnity from KP&L? We think not. The agreement specifically provides that KP&L will hold the City harmless in two situations: (1) from loss caused by the negligence of KP&L, its agents and employees, and (2) from loss due to the failure of KP&L to comply with the provisions of the agreement. Nothing in the agreement indicates any intent that KP&L will hold the City harmless from the negligence of its own agents and employees. The City in this case settled with the plaintiff for what the City determined was a reasonable amount to cover its own negligence and fault. Nowhere is there any indication that the settlement by the City contemplated payment for the fault or negligence of any of the other defendants, including KP&L. Likewise KP&L settled for its negligence, fault and liability and not for that of any other defendant. In *Missouri Pacific Railroad Co. v. City of Topeka,* 213 Kan. 658, 518 P.2d 372 (1973), we had occasion to review certain principles to be applied in the construction of indemnity agreements and held:

"An exculpatory agreement is to be construed strictly and its terms are not to be extended to situations not plainly within the language employed." Syl. ¶ 3.

The first alternative under the agreement clearly does not apply and the City, having settled its own liability for its own acts, likewise does not have a right of indemnity under the second alternative which applies only to breach of contract by KP&L.

Next, the City asserts that it has a common law right to indemnity based upon the theory that KP&L was the real wrongdoer and primarily liable for the injury. Insofar as the City attempts to assert a common-law right to total indemnity based upon the active-passive, primary-secondary or real wrongdoer dichotomy, that issue has been determined adversely to the City's position in *Ellis v. Union Pacific R.R. Co.,* 231 Kan. 182, and *Kennedy v. City of Sawyer,* 228 Kan. 439. The City, however, also asserts what appears to be a claim for partial indemnity or comparative im-

plied indemnity as enunciated in *Ellis* and *Kennedy.* In seeking recovery upon the common law theory of indemnity, the City relies upon *City of Fort Scott v. Penn Lubric Oil Co.,* 122 Kan. 369, 252 Pac. 268 (1927), and *City of Topeka v. Sash & Door Co.,* 97 Kan. 49, 154 Pac. 232 (1916). The City's reliance on *Fort Scott* and *Sash & Door Co.* is misplaced. In *Sash & Door Co.,* the City of Topeka was compelled to pay a judgment obtained against it by a pedestrian who fell and was injured on a defective sidewalk. The City sued Central Sash & Door Co. alleging the defects in the sidewalk were caused by defendant's use thereof. The court held that the petition stated a cause of action based upon the active fault of the defendant in producing the defective condition of the sidewalk. In *Fort Scott* the injured party brought suit against the City of Fort Scott and Penn Lubric Oil Co. for injuries received from a fall on a defective sidewalk. The oil company settled with the injured plaintiff who specifically reserved his right to proceed against the City, and in doing so obtained a judgment. The City in turn sought indemnity from the oil company on the basis that it was the oil company that created the dangerous and defective condition in the sidewalk. The court held that the city could recover against the oil company because the active negligence of the oil company as opposed to the passive negligence of the city breached an implied contract that the oil company would exercise due care and protect the public and the city from loss. The court stated that the primary liability rested with the oil company because it was the "real wrongdoer" and that the city was only secondarily liable. Obviously, *Fort Scott* and *Sash & Door* were decided long before the adoption of comparative negligence. We have held that under K.S.A. 60-258a each party in a comparative negligence action is only responsible for its own percentage of negligence and is not entitled to indemnity from another based upon an active-passive, primary-secondary or real wrongdoer classification. *Kennedy v. City of Sawyer,* 228 Kan. 439. Therefore the basis for finding implied indemnity in *Fort Scott* and *Sash & Door* is not viable under the facts in this case. Any right to implied indemnity can only arise when one has paid the obligation of another which was not the case here. The City specifically settled with the plaintiff for all of plaintiff's claims against the City and there is no showing that the City was in any way paying the plaintiff for any negligence or fault of KP&L.

In addition, there was no written contract in *Fort Scott* and *Sash & Door* which would control the rights of the parties. Here the City of Topeka and KP&L were operating under an express written agreement which established their obligations each to the other. Any indemnity between the parties would be limited to that provided by the terms of the written agreement.

We have carefully considered all points raised by appellant and conclude the action of the trial court in dismissing the City's cross-claim was correct. In view of the foregoing, the issue raised by KP&L on its cross-appeal is moot and need not be addressed.

The judgment is affirmed.