No. 47,065

Missouri Pacific Railroad Company, a corporation, *Appellee*, v. the City of Topeka, a municipal corporation, and Urban Renewal Agency of the City of Topeka, *Appellants*.

(518 P. 2d 372)

Opinion filed January 26, 1973.

*Donald Patterson*, of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *Dan E. Turner*, city attorney, was with him on the brief for the appellants.

*Ralph M. Hope*, of Lilleston, Spradling, Gott, Stallwitz & Hope, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Fontron, J.: This lawsuit is brought by the Missouri Pacific Railroad Company pursuant to the provisions of the declaratory judgment act, K. S. A. 60-1701, *et seq.* The railroad seeks a determination that it is entitled to be compensated by the City of Topeka for its expenses in relocating its tracks in connection with an urban renewal project. The trial court determined that the city was required to provide compensation and this appeal followed. We shall refer to the parties as plaintiff or railroad on the one hand and defendant or city on the other.

No facts are in dispute, the parties having stipulated with respect thereto. The train of events with which we are concerned began March 25, 1886, on which date the city enacted Ordinance No.

614 granting to the Kansas, Nebraska and Dakota Railroad Company a franchise for a right-of-way upon, along and across certain streets and alleys within the city, including portions of Adams Street involved in this lawsuit, for a period of twenty years. The ordinance provided that within thirty days the Railroad Company should file its acceptance with the city clerk, and this was done.

The Missouri Pacific Railroad Company, through succession, acquired all the property and interests of the Kansas, Nebraska and Dakota Railroad Company, including the franchise granted by Ordinance 614. The franchise was not renewed at the end of twenty years but the city took no action to compel the removal of the railroad tracks from Adams Street and the tracks have been maintained and used for railroad purposes in the same location as they were originally constructed.

Peace apparently prevailed between the railroad and the city until the current concept of urban renewal achieved popularity. In 1955 the Kansas Legislature enacted the Urban Renewal Law of this state, K. S. A. 17-4742, *et seq.*, thereby adding a new dimension to the rehabilitation and redevelopment of urban areas across the state.

In a general way it may be said that the 1955 law was promulgated to assist Kansas municipalities in the rehabilitation of their slum or blighted areas and to slow or prevent altogether the spread of urban decay. Municipalities were invested with broad and sweeping powers in undertaking and carrying out urban renewal plans, being empowered to close, vacate, pave, install, grade, regrade, plan or replan streets, roads, sidewalks, ways or other places. (K. S. A. 17-4748 [h], 17-4754 [a] [6].) Provision was made for the creation of municipal urban renewal agencies, with members to be appointed by the mayor with the advice and approval of the governing body, which might exercise the urban renewal powers of the municipality if the governing body should so elect. And perhaps best of all, Kansas cities were authorized to apply for and accept funds flowing from the federal spigot to assist them in achieving rejuvenation of their dilapidated districts.

The City of Topeka established an urban renewal agency June 26, 1956. On March 7, 1961, the city entered into a "cooperation agreement" with the agency with respect to carrying out an urban renewal plan known as the Keyway Project, whose history need not be recounted here. Portions of Adams Street bearing the Missouri Pacific Railroad tracks were included in the project and plans were

laid for the relocation of the trackage. Following a series of letters between the city and the railroad, the city adopted an ordinance requiring the railroad company to relocate its track facilities on Adams between First and Fourth Streets. The relocation of the tracks entailed an expense of $21,640 for which the railroad, understandably, desires to be compensated.

The railroad concedes the ordinary rule to be that a municipality may require a public utility to relocate its public facilities at its own expense. (*City of Wichita v. Kansas Gas & Electric Co.,* 204 Kan. 546, 553, 464 P. 2d 196; 12 McQuillin, Mun Corp [3rd Ed.] § 34.74a, pp. 183, 184.) However, it contends that the general rule is not controlling under the present facts; that the city in this instance is required by statute to compensate a public utility for the relocation of its facilities required by an urban renewal project. In this connection the railroad calls attention to the provisions of K. S. A. 17-4756 (*h*) which is an intregral part of the Urban Renewal Law. The statute reads as follows:

"*Provided,* That in the carrying out of the urban renewal plan under the provisions of this act, public utilities, either publicly or privately owned, shall not be required to locate, remove or readjust utility facilities and services without fair and reasonable compensation."

We are inclined to agree that the foregoing statute modifies the rule which ordinarily obtains with respect to the relocation of utility properties occupying public ways. The Urban Renewal Law is comprehensive in scope and provides its own procedures. The statute is explicit in its language and we believe it is controlling.

There is little authority squarely in point, factually speaking, but precedent is not entirely lacking. In 12 McQuillin, Mun Corp, *supra,* the statement is made that the common law duty of a public utility to relocate its lines at its own expense, when public convenience or necessity requires, may be changed by statute, thereby shifting the burden of payment to the state.

Perhaps the case most similar to ours is *Vt. Gas Systems, Inc. v. City of Burlington,* 130 Vt. 75, 286 A. 2d 275, where an urban renewal project discontinued some sections of the city streets and razed some residential buildings. As a consequence of the street vacations the gas company had to discontinue and abandon certain of its service lines and, in addition, had to install a new distribution line along a different route to maintain service to its customers. The company thereupon sued the city to recover the expense incurred. The Vermont Supreme Court held the gas

company entitled to reimbursement for the value of the property it was forced to abandon, the premise being that the statutory definition of real estate was sufficiently broad to include the pipes and fixtures lost to the utility by virtue of the urban renewal project. The opinion pointed out that in the view of the majority:

". . . [I]t was the purpose of the provisions of Chapter 71 of Title 24 of the Vermont Statutes Annotated to place upon the municipal taxpayers, rather than the rate-payers, the burden of reimbursement for real property taken in the carrying out of urban renewal, even though this property was already dedicated to a public use." (p. 82.)

By way of analogy a good many states have adopted legislation providing that the relocation of utility lines on public rights-of-way made necessary by the improvement of highways embraced within the National System of Interstate and Defense Highways be done at state expense, provided the cost of relocation is eligible for federal participation under the Federal-Aid Highway Act of 1958. (23 U. S. C. § 123.) In the majority of cases known to us legislation of this character has been upheld. (See *Pack v. Southern Bell T. & T. Co.*, 215 Tenn. 503, 387 S. W. 2d 789, and cases cited therein.)

It may also be said—for what it is worth—that authority exists for the proposition that the common-law duty of a public utility to relocate its facilities at its own expense when public necessity or convenience so requires, can be changed by contract between municipality and utility. (*New Rochelle Water Co. v. City of New Rochelle*, 18 App. Div. 2d 922, 238 N. Y. S. 2d 169.)

We turn to the second point raised by the city. Ordinance 614 contained a "hold harmless" clause reading as follows:

"The said railway company shall save the said City of Topeka harmless from all costs, damages and expenses for the payment of which the said city may become liable to any person or persons or corporation by reason of the granting of said right of way to said railway company, or by reason of the construction or operation of said railroad, or by reason of said railway company failing to construct suitable and proper crossings, culverts and water-ways, as herein provided, or by reason of said company failing to perform or comply with any of the provisions or requirements of this ordinance."

In brief, it is the city's position that this exculpatory clause is sufficiently broad to protect it, as indemnitee, against relocation expenses resulting from the city's urban renewal activities. The city cites several Kansas cases as tending to support this hypothesis. On the other hand, the railroad, as indemnitor, argues that the clause refers to and is intended to indemnify the city against liability to or

expenses incurred by third persons and not against expenses growing out of activities for which the city itself is responsible. Buttressing this line of argument the railroad would distinguish the cases on which the city depends.

A few observations as to indemnity seem pertinent. The word is generally defined as an obligation resting on a party to make good any loss another has incurred while acting at his request or for his benefit; it is a right which inures to a person who has fulfilled an obligation owed by him but which as between himself and another person should have been discharged by the other. (41 Am. Jur. 2d, Indemnity, § 1, p. 687.) In construing a contract of indemnity and determining the rights and liabilities of the parties thereunder, the important question to be determined is the intention of the parties, and effect should be given to that intention if such can be done consistently with legal principles. (41 Am. Jur. 2d, Indemnity, § 13, p. 697; 42 C. J. S., Indemnity, § 8 [a], p. 574.) Doubts arising from ambiguity or obscurity in the language used are to be resolved against the party preparing the contract (42 C. J. S., Indemnity, § 8 [a], p. 575) which, in the present case we assume was prepared by the city.

Almost eighty-eight years have passed into history since Topeka's city fathers adopted Ordinance 614, and the voices of those who participated in negotiations leading up to the granting of the franchise are no longer to be heard. We are left to judge of their intentions by what was said, and what left unsaid, in the ordinance.

As we view the "hold harmless" clause, to which the railroad is deemed to have agreed, there is no suggestion it was intended to provide protection against liability for expenses, loss or damage created or made necessary by actions of the city-franchisor. It is much more likely, from the language used, that the intended purpose was to protect the city from third-party claims for expenses, damages or loss stemming from activities of the railroad-franchisee, for which the franchisor itself might be liable also. Nothing was inserted in the exculpatory clause to indicate that the city was to be indemnified against expense or damage sustained by it stemming from its own actions. We deem the omission significant. It occurs to us that where parties to an indemnity agreement intend the indemnitor to indemnify the indemnitee against loss or liability caused by indemnitee's own negligence or activities, they should specifically and unambiguously so state in the agreement.

The decisions of this court cited by the city as sustaining its

position, *i. e.*, *Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 279 P. 2d 266, *Talley v. Skelly Oil Co.*, 199 Kan. 767, 433 P. 2d 425, and *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.*, 203 Kan. 720, 457 P. 2d 133, must be judged in the light of language found in the exculpatory provisions found in those cases.

In *Riddle Quarries, Inc. v. Thompson*, supra, the plaintiff had been granted a gratuitous license to store limestone on the Missouri Pacific Railroad Company right-of-way (Thompson being trustee of said company). The licensee, Riddle, was to indemnify and save harmless the licensor, Thompson, from all liability, damage and expenses, including costs, which the licensor might incur or suffer however caused and *whether or not caused or contributed to by the negligence of the licensor*, and the licensee agreed to assume the risk of all damage by fire however caused and *whether or not caused by the negligence of the licensor, its agents or servants*. Some of the limestone remained on the right-of-way after the license expired and was damaged by fire occasioned by the wreck of a Missouri Pacific freight train. The court said that under the license the only circumstances under which the plaintiff could recover would be for wanton and willful injury of the plaintiff (which was neither alleged by plaintiff nor found by the court).

A similar exculpatory clause was the subject of inquiry in *Talley v. Skelly Oil Co.*, supra. Skelly leased a filling station to Talley. The lessee agreed to protect the lessor from all claims for any loss or damage to property (*whether belonging to either of the parties or to third persons*) and to persons (*whether third persons, lessee, or lessee's employees*) growing out of lessee's operation or occupancy of the station *whether due to negligence of lessee, lessor or otherwise*. The scope of this save harmless agreement is far broader than the outreach of the exculpatory clause found in Ordinance 614 for it was specifically made to extend to and protect the lessor against injury resulting to the lessee from lessor's own negligent acts. This court held the exculpatory clause was binding upon the lessee, precluding the lessee from recovering damages against the lessor even though they might have been caused by lessor's own negligence.

The exculpatory features of the lease in *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.*, supra, were centered around the lessor's obligation to keep the improvements insured against damage by fire, the proceeds from insurance, in case of loss, to become available toward restoration of the leased premises. We need not

set out in detail the several clauses which obligated the lessor to maintain coverage against fire damage, other than to say, in the words of the opinion, that the terms employed in the lease manifested "an intention that neither party would have to bear a loss to the building caused by fire." A fire did occur and the insurance company paid the resulting loss. Under its rights of subrogation the insurer sued the lessee, contending that the fire was negligently caused by the lessee's employees. Recovery was denied on the basis that lessor's duty to insure was to protect the lessee's interests, as well as the lessor's, and that recovery could not be had against the lessee regardless of negligence on its part.

In our judgment the "hold harmless" clause inserted in Ordinance 614 does not disclose any such clear intention on the part of city and railroad as was manifested by the parties to the lease agreements involved in the foregoing cases. We have said that an exculpatory agreement is to be construed strictly and its terms will not be extended to situations not plainly within the language used. (*New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.*, supra, pp. 726, 727.) This principle appears peculiarly applicable to the facts of the instant case.

We find no error in the judgment entered in the court below and the judgment is affirmed.