(213 P.3d 621)
No. 99,963

EMPRISE BANK, a banking corporation, *Appellee*, v. JOHN D. RUMISEK AND GARY S. BENTON, *Appellants*.

GARY S. BENTON AND JOHN D. RUMISEK, *Third-party Plaintiffs/ Appellants/Cross-appellees*, v. MID AMERICA SURGICAL ASSO- CIATES, L.L.C., BADR IDBEIS, AND ROBERT FLEMING, *Third- party Defendants/Appellees/Cross-appellants*.

Opinion filed August 28, 2009.

*Alan L. Rupe*, of Kutak Rock, LLP, of Wichita, for appellants/third-party plaintiffs/cross-appellees.

*Michael G. Jones* and *W. Rick Griffin*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees/third-party defendants/cross-appellants.

Before MCANANY, P.J., ELLIOTT and CAPLINGER, JJ.

MCANANY, J.: This appeal arises out of Emprise Bank's suit against Drs. Gary S. Benton and John D. Rumisek to collect on personal guaranties they gave the bank to secure the debt of Mid America Surgical Associates, L.L.C. (MASA), the entity through which they conducted their specialty surgical practices. Benton and Rumisek, along with Drs. Badr Idbeis and Robert Fleming, owned and operated MASA. In response to the bank's suit, Benton and Rumisek asserted third-party claims against MASA, Idbeis, and Fleming for reimbursement, subrogation, contribution, and indemnity, as well as a claim that MASA was Idbeis' alter ego and, therefore, Idbeis was personally responsible for claims or judgments against MASA. Benton also asserted a third-party claim against Idbeis for breach of fiduciary duty.

Benton and Rumisek moved for summary judgment on their claims for reimbursement, subrogation, contribution, and indemnity. The third-party defendants moved for summary judgment on all third-party claims. In its letter opinion, the district court denied Benton and Rumisek's motion and entered summary judgment in favor of third-party defendants on all third-party claims.

Benton and Rumisek appeal, claiming the district court erred in denying summary judgment in their favor on their claims for reimbursement, subrogation, contribution, and indemnity. They also claim that the district court erred in granting summary judgment to the third-party defendants on all third-party claims.

MASA cross-appeals, claiming the district judge erred when he stated in his letter ruling: "I agree with 3PPs [third-party plaintiffs] that no equities need balancing in determining whether the right

of subrogation exists for 3PPs. Such a right is inherent between a surety and his principal." MASA contends that while the district court did not err in granting summary judgment in its favor on Benton and Rumisek's subrogation claim on other grounds, the court also should have done so by weighing the equities and resolving the equities in favor of MASA.·

In our de novo review of the respective summary judgment motions, we conclude:

- The release signed by Benton and Rumisek did not release their claim for subrogation. Nevertheless, because Benton and Rumisek have not paid Emprise Bank for MASA's debt for which they gave their personal guaranties, they are not entitled to summary judgment on their subrogation claim but the third-party defendants are.
- The fact that Benton and Rumisek have no current subrogation right (*i.e.*, the right to now stand in the shoes of the bank with respect to the bank's rights against MASA, its debtor) is not predicated upon the balancing of equities, as third-party defendants claim in their cross-appeal. Under the circumstances, upon full payment of MASA's debt to the bank Benton and Rumisek will have an inherent right of subrogation.
- Benton and Rumisek did not release their right to indemnity when they executed the Unit Redemption Agreement (URA). Benton and Rumisek are entitled to indemnity from MASA with respect to the judgments the bank obtained against them on their personal guaranties of MASA's debt.
- Benton and Rumisek are not entitled to contribution from Idbeis and Fleming at the present time. While the bank has obtained judgments against Benton and Rumisek for amounts in excess of their pro rata shares of MASA's debt, they have not yet paid the bank sums in excess of their pro rata shares so as to entitle them to contribution.
- Idbeis owed no fiduciary duty to Benton for conduct after Benton surrendered his shares in MASA. With respect to any claims for breach of fiduciary duties predating the surrender of his shares, Benton released those claims upon signing the URA.

- There remain genuine issues of material fact with respect to Benton and Rumisek's claim that MASA was merely Idbeis' alter ego. Accordingly, the third-party defendants are not entitled to summary judgment on this claim, and we remand this claim to the district court for trial.

*Facts*

An overview of the background facts is necessary to understand the various claims. Benton, Fleming, Idbeis, and Rumisek formerly practiced together at Wichita Surgical Specialists, P.A. (WSS). Idbeis was discharged from WSS in March 2002. Promptly thereafter, Benton, Fleming, and Rumisek voluntarily left WSS and the four doctors formed MASA in order to continue their surgical practice in Wichita, notwithstanding the covenants not to compete each had given WSS. Idbeis was designated president of MASA and charged with its day-to-day management. Subject to certain limitations, MASA's articles of incorporation and its operating agreement provided for MASA to indemnify any member who was "made a party to a proceeding because he is or was a Member, officer, organizer, employee or agent of the Company."

In June 2002, MASA obtained an $800,000 line of credit from the Emprise Bank to fund the operation. The credit line was secured by, among other things, the personal guaranties of the four doctors, each in the amount of $200,000, representing each doctor's 25% interest in MASA. The credit line was used in part to pay the doctors their periodic draws and annual bonuses.

By December 2002, MASA needed to increase its line of credit. The bank increased the credit line to $1.5 million. The four doctors each gave the bank an additional $375,000 personal guaranty as security.

Faced with potential liability to WSS for violating their covenants not to compete, the four doctors commenced an action in the district court to enjoin enforcement of the covenants. The district court found that the restrictive covenants were valid and enforceable. On appeal, the Kansas Supreme Court agreed. *Idbeis v. Wichita Surgical Specialists, P.A.,* 279 Kan. 755, 112 P.3d 81 (2005). Idbeis' contract with WSS permitted him to pay liquidated

damages in lieu of discontinuing his competing practice. The contracts of Rumisek, Benton, and Fleming had no such provision. Accordingly, the district court ordered Rumisek, Benton, and Fleming to cease their competing practices for the 2-year duration of their covenants.

Benton left MASA in August 2005 and moved his practice to Hays. Fleming and Rumisek left MASA in October 2005. Fleming went to Salina, and Rumisek went to Louisville, Kentucky. They all left with the understanding that Idbeis would continue to operate MASA and with the hope that they would be able to rejoin Idbeis and MASA upon expiration of their covenants not to compete. To that end, they agreed that MASA should pay Idbeis' liquidated damages to WSS in order to permit him to continue the practice in competition with WSS. Fleming ultimately returned to practice with Idbeis. Benton and Rumisek never did.

When they left, Benton, Fleming, and Rumisek each executed the URA and surrendered their shares in MASA for a nominal sum. The URA contained a mutual release pursuant to which Benton, Fleming, and Rumisek released MASA and its members "from any and all claims, demands, or causes of action of whatever kind or nature, known or unknown" which Benton, Fleming, and Rumisek "may have had in the past or may now have against [MASA], [MASA's] members, employees, agents, affiliates, either individually or in their representative capacities."

In January 2007, Idbeis formed Cedar Surgical, L.L.C., with the expectation that he would shift his practice from MASA to this new entity and close MASA. The bank refused to renew MASA's loan. Idbeis and Fleming entered into forbearance agreements with the bank, again promising to honor their $375,000 personal guaranties. Apparently, the bank never commenced legal proceedings against Idbeis and Fleming, and Benton and Rumisek contend that Idbeis and Fleming have not honored their personal guaranties.

In March 2007, the bank commenced this action to collect from Benton and Rumisek on their personal guaranties. Their third-party action against MASA, Idbeis, and Fleming followed. Benton settled with the bank by agreeing to pay $375,000 plus interest on his guaranty. The court entered judgment against Rumisek on his

personal guaranty. The parties then filed their competing summary judgment motions which are the subject of this appeal.

*Standards of Review*

The standards for considering summary judgment motions are well known and can be found in *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 (2007). We apply those same standards in our de novo review. See *Cooke v. Gillespie*, 285 Kan. 748, 754, 176 P.3d 144 (2008). To the extent the parties' claims require the interpretation of the terms and effects of their various contracts, our review is similarly unlimited. *Conner v. Occidental Fire & Cas. Co.*, 281 Kan. 875, 881, 135 P.3d 1230 (2006).

Benton and Rumisek appeal adverse rulings on their claims based upon subrogation, indemnification, contribution, breach of fiduciary duties, and alter ego. We will first consider the subrogation claim.

*Subrogation*

Benton and Rumisek alleged in their third-party action that if the bank obtained judgments against them on their personal guaranties for MASA's debt, they would be entitled to reimbursement from MASA and would be subrogated to the bank's rights against MASA. In essence, they contend that under principles of subrogation they will stand in the shoes of the bank and be empowered to exercise all the rights and remedies which the bank could employ to collect on MASA's debt.

In August 2007, the district court entered judgment in favor of the bank and against Benton and Rumisek on their personal guaranties. Both third-party plaintiffs and third-party defendants moved for summary judgment on this theory of relief. All parties contend that there are no genuine issues of material fact in dispute which would preclude summary judgment.

The district court found that Benton and Rumisek had subrogation rights, but it denied them summary judgment and granted summary judgment to MASA because, according to the district court, Benton and Rumisek had released their subrogation rights by executing the release contained in the URA. The court found:

"c) The Mutual Release bars '. . . any and all claims, demands, or causes of action of whatever kind or nature, known or unknown, which Seller may have had in the past or may now have against the Company. . . .'

. . . .

"e) The Mutual Release, however, precludes 3PPs from asserting and seeking subrogation now. The subrogation right, which is the basis for the claim of 3PPs, existed at the time the URA was signed and in as much that a claim is an assertion of an existing right, 3PPs fail because no subrogation right exist post-October 2005 by virtue of the aforementioned release signed in October 2005."

The immediate issue addressed by the parties in this appeal is whether the district court erred in this legal conclusion. This issue does not turn on the validity of the release, but its scope. Ultimately, however, we must determine de novo whether summary judgment is warranted on this claim.

### — The Release: The Words Employed

The release provision relied upon by the third-party defendants and by the district court states:

"Seller does hereby release, acquit, and forever discharge Company, and Company's members, employees, agents, affiliates, in their representative capacities, and their respective heirs, personal representatives, successors and assigns, from any and all claims, demands, or causes of action of whatever kind or nature, known or unknown, which Seller may have had in the past or may now have against Company, Company's members, employees, agents, affiliates, either individually or in their representative capacities, and their respective heirs, personal representatives, successors and assigns, except as the same may relate to the failure of Company to fulfill Company's obligations pursuant to this Agreement."

The immediate question is whether the guarantors' right to be subrogated to the bank's position had matured into a *claim, demand,* or *cause of action* at the time the release was signed. Having examined the words of the release itself and the relevant cases, we conclude that it did not. First, we examine the words employed in the release.

### (1)   Claim

MASA argues that Benton and Rumisek had claims against MASA for subrogation at the time they gave their guaranties and that they released their claims upon signing the URA. The dictionary and Code of Civil Procedure definitions suggest other-

wise. The primary definition of a claim, as set forth in Black's Dictionary 264 (8th ed. 2008), is "[t]he aggregate of operative facts giving rise to a right enforceable by a court." Benton and Rumisek did not release all of their "rights" in the URA, only those rights on which they could currently sue.

Likewise, K.S.A. 60-208 provides that a claim for relief consists of "(1) A short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief to which the pleader deems such pleader's self entitled." Until their obligations pursuant to the guaranties are satisfied, Benton and Rumisek cannot demonstrate an entitlement to relief. Thus, the release does not affect the currently claimed right of subrogation.

However, MASA argues that Benton and Rumisek's use of third-party practice under K.S.A. 60-214 confirms that they had claims for subrogation rights upon giving the bank their guaranties, claims which were released in the URA. We view this as an overbroad reading of the term "claim." K.S.A. 60-214 sets forth the procedure for third-party practice:

"At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and petition to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."

Here, Benton and Rumisek had neither the right nor a claim to be subrogated to the rights of the bank against MASA at the time the URA was signed in 2005. As we shall see momentarily, their claim of subrogation arises only by reason of having honored their guaranties. If MASA had paid its debt to the bank, the bank would have no recourse against Benton and Rumisek on their personal guaranties, and Benton and Rumisek would have no claim to be subrogated to the bank's rights. Had MASA paid its debt, the court certainly would not entertain an independent claim by Benton and Rumisek to subrogation rights. Third-party practice under K.S.A. 60-214 is simply a procedural device to avoid circuitous and piecemeal litigation. See *Alseike v. Miller*, 196 Kan. 547, 412 P.2d 1007 (1966). Benton and Rumisek did not have a claim for subrogation rights when they signed the release.

### (2)   Demand

Next, MASA argues that "to the extent [Benton and Rumisek's] subrogation rights constituted a demand against or relating to MASA, they too were released." As a noun, "demand" is defined as "[t]he assertion of a legal or procedural right"; as a verb, it means "[t]o claim as one's due; to require; to seek relief. . . . To summon; to call into court." Black's Dictionary 462 (8th ed. 2008). Obviously, the notion of a demand is predicated upon the existence of a legally recognized right. At the time the release was signed, did Benton and Rumisek have the right to demand that they be subrogated to the rights of the bank against MASA? Clearly not. The bank had taken no action against them on their personal guaranties. The release, which applies only to demands in existence at the time of execution of the release, does not bar Benton and Rumisek's demand in their third-party action that, if the bank obtained a judgment against them on their guaranties, they should be subrogated to the bank's rights against MASA.

### (3)   Cause of Action

MASA argues that the term "cause of action" in the URA release encompasses Benton and Rumisek's third-party action for subrogation. A "cause of action" has long been defined as a "state of facts that entitles a party to maintain an action in a judicial tribunal." Bryant, The Law of Pleading Under the Codes of Civil Procedure 170 (2d ed. 1899). It is currently defined as "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." Black's Dictionary 235 (8th ed. 2008); see *Schmidt v. Shearer*, 26 Kan. App. 2d 760, 768-70, 995 P.2d 381 (1999).

As explained earlier, Benton and Rumisek clearly had no cause of action against MASA when they executed their guaranties or when they later executed the URA release. A *sine qua non* of Benton and Rumisek's cause of action for subrogation is the bank's action to recover against them on their guaranties. The bank's action against Benton and Rumisek commenced long after the execution of the URA.

As a final point regarding the language of the release, MASA points to the phrase "of whatever kind or nature." We view this phrase as rather redundant since the release already applies to *all* claims, demands, and causes of action. Further, we are not persuaded by MASA's argument that there can be "varying degrees" of causes of action, and the release covered all. Much like being dead or pregnant, one either is or is not. A cause of action either exists or it does not. The addition of this phrase does not alter our analysis.

### —The Release: Cases

Turning to the cases, MASA cites a number of cases from foreign jurisdictions in which the court upheld a release in circumstances MASA claims are comparable to those before us. We do not find any of them to apply. The releases at issue in MASA's cited cases were in settlement of an existing claim (most were personal injury claims arising from automobile collisions) which covered all claims arising out of the accident or the incident which was the subject of the dispute. *Brown v. Eakin*, 137 A.2d 385 (Del. Super. 1957); *Rakowski v. Lucente*, 104 Ill. 2d 717, 472 N.E.2d 791 (1984); and *Norton v. Benjamin*, 220 A.2d 248 (Me. 1966), all involved releases in settlement of personal injury claims. The releases in all these cases released all claims, now or in the future, arising out of the accident referred to in the release. Here, however, Benton and Rumisek specifically released only existing claims against MASA, not claims that may arise in the future.

MASA also relies on *Sword & Shield Restaurant v. Amoco Oil Co.*, 420 N.E.2d 32 (Mass. App. 1981). *Sword* involves a claim for contribution, not subrogation. In *Sword,* the restaurant sued Amoco when its gasoline leaked from an underground storage tank into the restaurant's basement. Six days after the leak occurred, Amoco and its tenant, who occupied the service station where the leak originated, exchanged comprehensive mutual releases. After settling with the restaurant, Amoco brought an action for contribution against its former tenant. The court denied Amoco's contribution claim, noting that even though the claim was unknown to

the tortfeasors at the time of the release, the release covered all known or unknown, then-existing claims. 420 N.E.2d at 33-34.

*Sword* fails MASA because Amoco's release ran from "the beginning of time" until 6 days after the leak occurred. 420 N.E.2d at 33. The restaurant's claim against Amoco arose on the day of the leak. The release was simply an arrangement between the joint tortfeasors as to who would pay the plaintiff's claim. Here, Benton and Rumisek's subrogation claim did not exist at the time they executed the URA, and the URA covered only then-existing claims against MASA.

Finally, in *Lady Corinne Trawlers, Inc. v. Zurich Ins. Co.*, 507 So. 2d 915 (Ala. 1987), the insured owner of a damaged fishing boat made claims for the loss against Sanders who made defective repairs as well as against plaintiff's own insurance company on the policy. The insured boat-owner settled with Sanders and gave Sanders a release which applied to "all claims, damages, actions, causes of action, suits at law, or in equity, arising, or to arise as a result of said allegedly faulty and defective repairs . . . ." 507 So. 2d at 916-17. Giving the release violated plaintiff's insurance policy because it constituted an agreement to release a subrogation right which, on payment of the claim by the insurance company, would belong to the insurance company. The trial court granted summary judgment to the insurer, finding the insured breached the policy. The Alabama Supreme Court affirmed. 507 So. 2d at 918.

In *Lady Corinne*, the insurer's subrogation right provided for in the policy did not mature into a claim or cause of action until after execution of the release. The Alabama Supreme Court stated: "Zurich's subrogation rights had not yet ripened . . . . Thus, at the time the plaintiff executed the agreement with Saunders, [plaintiff] was still the owner of any claims against Saunders." 507 So. 2d at 918. *Lady Corinne* is not helpful to MASA.

The Tenth Circuit Court of Appeals addressed the issue in *Allen v. Sybase, Inc.*, 468 F.3d 642 (10th Cir. 2006). *Allen* involved claims for violation of the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2101 *et seq*. WARN imposes liability on an employer who fails to give the required notice to certain employees who lose their jobs as part of a plant closing or mass layoff.

The Act and its implementing regulations require that terminated employees (including the first employee terminated during the relevant period) who are aggregated during a 90-day period so as to constitute a mass layoff are entitled to notice under the Act.

Plaintiffs were terminated without notice prior to October 31, 2001. They accepted severance packages from their employer in exchange for releases of all claims they had against their employer. Plaintiffs sued for relief pursuant to WARN, and the employer raised the release as a bar to the claims. The district court granted summary judgment to plaintiffs, and the Tenth Circuit affirmed. 468 F.3d at 663. The court determined that the number of terminated employees reached the WARN threshold on October 31, 2001. Plaintiffs were within that aggregation that reached the threshold number of laid-off employees and, therefore, were entitled to notice under the Act. While plaintiffs had the right under WARN to notice of their terminations once the aggregate number of laid-off employees reached the WARN threshold, their rights under WARN did not mature into an actionable claim until October 31, 2001, which was after they signed the releases. The release applied to "any claims, liabilities, demands or causes of action, known or unknown, that I ever had, now have or may claim to have had against the Company . . . as of the date of this release." 468 F.3d at 646. The court concluded:

"Because the plaintiffs' WARN claims did not accrue until the mass layoff occurred on October 31, 2001, those claims were not in existence 'as of the date of [the] Release.' *Id.* at 280. Therefore, plaintiffs did not waive their rights to sue defendants for violation of their WARN Act rights." 468 F.3d at 655.

*Narans v. Paulsen*, 803 P.2d 358 (Wyo. 1990), is very much on point. In *Narans*, Paulson was the co-maker of a partnership's promissory note. When Paulsen left the partnership the firm bought out his interest, including his obligation on the note. Paulsen gave the firm a release. However, the bank did not release him from the note. The partnership defaulted on the note, and Paulsen was required to pay the note. He then sued the partnership and the firm raised the release as a defense. The release applied to "any and all claims demands and causes of action which may now exist,

whether presently known or unknown." 803 P.2d at 362. The Wyoming Supreme Court held that the release did not bar Paulsen's claim because at the time of the buyout, the partnership had not defaulted, nor had the bank sought payment from Paulsen. Therefore, Paulsen's claim did not exist at the time he left the firm and gave his release. 803 P.2d at 362.

Based upon the language of the release and the case law from other jurisdictions, we conclude that Benton and Rumisek's subrogation rights had not matured into a claim, demand, or cause of action at the time they executed the release contained in the URA. Therefore, Benton and Rumisek did not release their subrogation claims through the URA, and the district court erred in its contrary conclusion.

*—Payment*

As an alternate basis for summary judgment, third-party defendants assert that Benton and Rumisek have no subrogation rights because they have not paid MASA's debt to the bank. This argument is based upon the exact opposite of the theory used to support their release defense. They find support in *Halpin v. Frankenberger*, 231 Kan. 344, 350, 644 P.2d 452 (1982), the same case relied upon by Benton and Rumisek. In *Halpin* the court stated:

"A surety or guarantor, on paying the debt of the principal, is entitled to be subrogated to the rights of the creditor in all or any of the securities, means or remedies which the creditor has for enforcing payment against the principal debtor or against other sureties or guarantors." 231 Kan. 344, Syl. ¶ 4.

In their statement of uncontroverted facts, third-party defendants assert that while the bank has obtained judgments against Benton and Rumisek on their personal guaranties, neither has satisfied the judgment against him (let alone the entirety of the MASA's debt to the bank). Benton and Rumisek concede that they have not satisfied the judgments but assert without reference to the record that Benton has paid interest on the judgment against him and Rumisek has paid part of his judgment. Supreme Court Rule 141(b) (2008 Kan. Ct. R. Annot. 222) requires Benton and Rumisek to make precise references to the record of the evidence which they claim controverts the claimed uncontroverted facts of

the third-party defendants. See *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 603-04, 738 P.2d 1246 (1987). They have not done so. This assertion by third-party defendants remains uncontroverted.

Part payment will not create a right of subrogation; nor will unsatisfied judgments against Benton and Rumisek on their personal guaranties. See *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 646, 666 P.2d 192 (1983). Otherwise, the bank would be required to relinquish its creditor position to Benton and Rumisek under the principle of subrogation while MASA's debt to the bank remains unpaid. See *Standard Surety & Cas. Co. v. Standard Acc. Ins. Co.*, 104 F.2d 492, 497 (8th Cir. 1939).

The fact that at some time in the future Benton and Rumisek may pay MASA's debt to the bank so as to place them in the shoes of the bank with respect to the bank's claims against MASA does not support a claim that Benton and Rumisek are entitled to judgment today declaring they have subrogation rights against MASA. Refusing to judicially declare in these proceedings that Benton and Rumisek may in the future become subrogated to the bank's rights against MASA does not undermine the judicial economy envisioned by third-party proceedings pursuant to K.S.A. 60-214.

Based on the uncontroverted facts now before us, the third-party defendants are entitled to summary judgment on the claim that Benton and Rumisek are subrogated to the bank's rights against MASA by virtue of the bank having obtained judgments against them on their personal guaranties. Benton and Rumisek's rights to be subrogated to the bank's position *vis-a-vis* MASA is predicated upon full payment of MASA's debt to Emprise, not merely upon being obligated to pay.

*—The Cross-Appeal*

As a final point on the issue of subrogation, MASA contends in its cross-appeal that the district court erred in finding that Benton and Rumisek had an inherent right of subrogation, rather than requiring a balancing of equities which, if properly done, would have favored MASA and led to the conclusion that under equitable principles Benton and Rumisek had no subrogation rights. The

district judge found: "I agree with 3PPs that no equities need balancing in determining whether the right of subrogation exists for 3PPs. Such a right is inherent between a surety and his principal." We agree in principle with the district court on the inherent right of subrogation. However, as discussed earlier, that right is predicated upon payment by the guarantors, a condition which is yet to be satisfied.

As MASA correctly notes, modern subrogation is a creature of equity. However, Benton and Rumisek's rights as guarantors to be subrogated to the bank's rights against MASA do not arise from the modern expansion of subrogation based upon equitable principles. As explained by the Kansas Supreme Court in *Fenly v. Revell,* 170 Kan. 705, 709, 228 P.2d 905 (1951):

"In the beginning the doctrine of subrogation was somewhat strictly and narrowly applied and was limited to transactions between principals and sureties. As the years went by it was liberalized and expanded to the extent it can now be said that it is a favorite of the law and applied to almost every kind of a situation where it will subserve the ends of justice and equity. [Citations omitted.] . . .

" '. . . Since the doctrine was first ingrafted on equity jurisprudence, it has been steadily expanding and growing in importance and extent, and is no longer, as formerly, limited to sureties and quasi sureties, but is now broad and expansive and has a very liberal application.' "

The absolute right of subrogation as between surety and principal has been affirmed by several other Kansas cases. See *Benschoter v. First National Bank of Lawrence,* 218 Kan. 144, 154-55, 542 P.2d 1042 (1975), *appeal dismissed* 425 U.S. 928 (1976); *Mountain Iron & Supply Co. v. Jones,* 201 Kan. 401, 408, 441 P.2d 795 (1968); *Blitz v. Metzger,* 119 Kan. 760, 768, 241 Pac. 259 (1925); *Western Surety Co. v. Loy,* 3 Kan. App. 2d 310, 312-14, 594 P.2d 257 (1979). Accordingly, we conclude that the district court did not err, as MASA claims in its cross-appeal, in recognizing that the equities need not be weighed in determining a guarantors' subrogation rights.

### Indemnification

In the operating agreement, MASA agreed to hold harmless its manager, board of directors, and its members from any and all losses or claims incurred *"by reason of the fact* that an Indemnitee

is or was a Member," subject to conditions which are not relevant here. (Emphasis added.) In denying Benton and Rumisek's motion for summary judgment and granting MASA's motion, the district court made no specific mention of the indemnification claims. This is of no moment since our consideration of the motions is de novo.

Indemnity is "an obligation resting on a party to make good any loss another has incurred while acting at his request or for his benefit." *Missouri Pacific Railroad Co. v. City of Topeka,* 213 Kan. 658, 662, 518 P.2d 372 (1974). Indemnity generally arises from either an expressed contract of indemnity or an implied right of indemnity "when one is compelled to pay what another party ought to pay." *Haysville U.S.D. No. 261,* 233 Kan. at 642.

If there is an ambiguity in a contract of express indemnity, we apply the general rules of contract construction. *Chetopa State Bancshares, Inc. v. Fox,* 6 Kan. App. 2d 326, 332, 628 P.2d 249, *rev. denied* 229 Kan. 669 (1981). Generally, "the important question to be determined is the intention of the parties, and effect should be given to that intention if such can be done consistently with legal principles. [Citations omitted.]" *Missouri Pacific,* 213 Kan. at 662.

K.S.A. 17-6305(a) permits a corporation to indemnify persons with respect to actions against such persons "by reason of the fact that such person is or was a director, officer, employee or agent of the corporation." This broad indemnity power is also available to limited liability companies pursuant to K.S.A. 17-7670(a) and may apply to "any and all claims and demands whatsoever."

There is no Kansas case law that directly addresses the issue of whether MASA's promise in its operating agreement to hold its members harmless from claims incurred *"by reason of the fact* that an Indemnitee is or was a Member" of MASA applies to the bank's claims against Benton and Rumisek on their personal guaranties of MASA's debt. However, because Kansas corporate indemnity law is modeled after Delaware's law on the subject, see *Fleischer v. F.D.I.C.,* 70 F. Supp. 2d 1238, 1243 (D. Kan. 1999), we look to Delaware for guidance.

*Witco Corp. v. Beekhuis,* 38 F.3d 682 (3d Cir. 1994), considered Delaware's similar indemnity principles. In *Witco,* the court stated

that Delaware's indemnification provisions are to be interpreted broadly in order to fulfill the public policy of encouraging " 'capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve.' [Citations omitted.]" 38 F.3d at 691. The court held that a corporate officer has the right, as a matter of law, to be indemnified by the corporation if there is a close nexus between the lawsuit filed against the officer and his status as a corporate officer. 38 F.3d at 692-93.

In *Heffernan v. Pacific Dunlop GNB Corp.*, 965 F.2d 369, 372 (7th Cir. 1992), the court broadly interpreted Delaware's "by reason of the fact" indemnity provisions. Heffernan, a member of the company's board of directors, sold his personal stock in the company to Pacific without disclosing certain liabilities the company faced. When Pacific sued Heffernan pursuant to § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l, for material misrepresentations in the sale of his stock, Heffernan sought indemnification from the company. In finding that the suit against Heffernan was "by reason of the fact" that he was a director of the corporation, the court noted:

"Delaware is no neophyte in corporate law matters. Had it desired to limit permissible indemnification solely to those suits in which a director is sued for breaching a duty of his directorship or for certain enumerated causes of action, it would have jettisoned the supple 'by reason of the fact that' phrase in favor of more specific language. Had Delaware desired to so limit its indemnification statute, we are confident that it could have found the words. [Defendants] have given us no reason to doubt that Delaware's choice of language was anything but purposeful and strategic. We believe that Delaware's 'by reason of the fact that' phrase is broad enough to encompass suits against a director in his official capacity as well as suits against a director that arise more tangentially from his role, position or status as a director." 965 F.2d at 375.

The nexus between the bank's claims against Benton and Rumisek and their status as members of MASA is clear and close. The need for operating funds for the new venture was immediate. The Bank provided those funds. The bank's loan was conditioned upon personal guaranties from the principals as additional security. The personal guaranties of Benton and Rumisek were a *sine qua non*

for MASA's operation. MASA was unable to meet its loan obligation, and Benton and Rumisek were called upon to honor their guaranties. There is a clear and close nexus between the bank's actions to enforce these guaranties and Benton and Rumisek's participation in MASA. They are entitled to indemnification from MASA.

MASA argues, however, that Benton and Rumisek released their right to indemnity when they signed the URA. For the reasons discussed earlier in the subrogation context, we disagree. Until MASA defaulted on the loan and the bank took action against Benton and Rumisek, there was no claim upon which to predicate a right to indemnity. Benton and Rumisek had no claim, demand, or cause of action for indemnity against MASA at the time they executed the URA. Since then the bank has obtained judgments against Benton and Rumisek on their guaranties of MASA's debt. MASA is obligated to indemnify Benton and Rumisek with respect to those judgments. The district court erred in entering judgment in favor of MASA on this claim and in denying summary judgment to Benton and Rumisek for indemnity.

### Contribution

Benton and Rumisek contend that although the four principals of MASA each guaranteed an equal amount of MASA's debt to the bank, Benton and Rumisek have been ordered to pay more than their proportionate share. Thus, they contend they are entitled to contribution from Idbeis and Fleming to the extent this disproportionate share of MASA's debt has been imposed on them. The district court rejected this claim, finding that "[n]o one doctor is liable beyond 25% of the total debt."

Under Kansas law, a guarantor may seek contribution from a co-guarantor. Even absent an explicit agreement to do so, "it is clear that one co-guarantor has a common law right to contribution from his co-guarantors." *Halpin*, 231 Kan. at 350. This obligation is not based on the guaranty agreement itself, but "on an implied agreement that if the guaranty is enforced, each guarantor will contribute his or her just proportion of the amount for which he or she might be held liable." *Kee v. Lofton*, 12 Kan. App. 2d 155, 159,

737 P.2d 55 (1987). Each co-guarantor's obligation of repayment and subsequent contribution "must be equally and ratably made." 12 Kan. App. 2d at 159. However, a co-guarantor's right to contribution "does not arise until a guarantor has paid more than his or her share of the common obligation." 12 Kan. App. 2d at 160. Until such payment is made, this right to contribution is merely contingent. 12 Kan. App. 2d at 160.

The record supports Benton and Rumisek's allegation that they have been ordered to pay more than their 25% proportionate shares of MASA's debt. The district court entered a judgment in favor of the bank and against Rumisek on his guaranty for $375,000 plus interest and fees. Prior to the entry of judgment against Benton, he settled with the bank and agreed to pay the bank $375,000 plus interest. As a result, Benton and Rumisek are together responsible for $750,000 of the $1,232,315.24 principal (approximately 30.4% each) due on MASA's credit line. Their pro rata share was only 25% each.

The district court erred in concluding that each co-guarantor was only asked to pay 25% of the Emprise debt. Nevertheless, Benton and Rumisek have not yet made payments to the bank that exceeded their 25% proportionate share of MASA's debt. Until they do so, they have no claim against Idbeis and Fleming for contribution. See *Kee*, 12 Kan. App. 2d at 160. Thus, the court did not err in entering judgments in favor of Idbeis and Fleming and against Benton and Rumisek on these claims.

### Fiduciary Duty

Next, Benton argues that the district court erred in granting summary judgment to Idbeis on the ground that Benton's fiduciary duty claim was moot. Benton further alleges that if the district court had reached the merits of his claim, he would have prevailed because Idbeis breached fiduciary duties under the operating agreement and the LLC resolution.

Once again, the district court's lack of specificity in its ruling does not present a hurdle because our review is de novo. Idbeis was designated the manager of the firm's operation. As such, he owed a fiduciary duty to the other members of MASA, including

Benton. See *Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 208, 25 P.3d 871, *rev. denied* 272 Kan. 1419 (2001) (holding that a fiduciary relationship exists, by contract or by operation of law, "where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence"). Kansas law " 'imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders.' [Citation omitted.]" *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 416, 77 P.3d 130 (2003). As a consequence of this duty, corporate officers and directors " 'are liable to the corporation and the stockholders for losses resulting from their malfeasance, misfeasance or their failure or neglect to discharge the duties imposed by their offices.' [Citations omitted.]" 276 Kan. at 416.

Benton points to the following provision in the operating agreement: "The Manager/President shall be imposed with a fiduciary duty to conduct the business and affairs of the Company in the best interests of the Company and of the Members." Further, he cites the LLC resolution given to the bank at the origination of the loan. In it, MASA's principals promised to "do all things necessary to preserve and to keep in full force and effect [MASA's] existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities." Benton argues that he relied on Idbeis as a fiduciary in handling matters related to the Emprise loan.

Upon signing the URA and surrendering his shares in MASA, Benton ended his membership in MASA. Accordingly, any fiduciary duties Idbeis owed to Benton as a member of MASA ended. While Benton is entitled to reimbursement from MASA for payments he makes on MASA's debt to the bank, Benton is not entitled to damages for breach of fiduciary duties based upon Idbeis' conduct occurring after Benton surrendered his shares and was no longer a member of MASA.

Further, to the extent that Benton claims Idbeis failed to meet his fiduciary duties while Benton was a member of MASA, those claims were released when Benton signed the URA in which he released MASA and its members "from any and all claims, demands, or causes of action of whatever kind or nature, known or unknown, which [Benton] may have had in the past or may now have."

Idbeis is entitled to summary judgment on Benton's breach of fiduciary duties claim.

*Alter Ego*

Finally, Benton and Rumisek argue that the district court erred in granting summary judgment to Idbeis on their alter ego claim, finding the claim to be moot. In our de novo review we must determine whether, viewing the facts in the light more favoring Benton and Rumisek, there is a genuine issue of material fact requiring a trial on this claim

As stated in *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 797, 473 P.2d 33 (1970):

"[T]he doctrine of *alter ego* fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, such liability arising from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. Under it the court merely disregards corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation. [Citation omitted.]"

See *Mr. Cinnamon of Kansas, Inc. v. Hall*, 41 Kan. App. 2d 457, Syl. ¶ 4, 202 P.3d 734 (2009).

In *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, 355, 76 P.3d 1000 (2003), our Supreme Court identified eight factors for courts to consider in resolving whether to pierce the corporate veil and hold the corporation's owner personally accountable:

" '(1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.' [Citation omitted.]"

Single ownership of a corporation is not sufficient by itself to call the corporation an alter ego of the owner and pierce the corporate veil. *Poynter*, 205 Kan. 787, Syl. ¶ 6. The cases do not enumerate how many factors must be present before a corporation is determined to be an alter ego of its owner.

MASA and Idbeis argued that Benton and Rumisek produced no evidence to substantiate any of the *Graeber* factors. However, Benton and Rumisek focused on four of the *Graeber* factors in responding to MASA and Idbeis' summary judgment motion: undercapitalization, siphoning, using the corporation as a facade, and promoting injustice. They also cited facts "general to all the *Graeber* factors." Obviously, to create a genuine issue of material fact, the facts giving rise to this claim must have occurred after Fleming, Benton, and Rumisek left MASA in the summer and fall of 2005.

We are mindful that whether MASA is Idbeis' alter ego is a question of fact. See *Doughty v. CSX Transportation, Inc.*, 258 Kan. 493, 498-99, 905 P.2d 106 (1995). It is well established that "[e]ach case involving disregard of the corporate entity must rest upon its special facts." *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743 (1983); *Golconda Screw, Inc. v. West Bottoms Ltd.*, 20 Kan. App. 2d 1002, 1011, 894 P.2d 260 (1995).

In support of the undercapitalization factor, Benton and Rumisek point out that although MASA could afford to pay Idbeis' salary and judgment to WSS, Idbeis informed the bank in 2006 that MASA was not generating enough money to make its monthly payments. They also point out that Idbeis lent MASA money from his personal checking account so that MASA could make payroll without issuing promissory notes for the loans, though this is more of a failed formalities fact than an undercapitalization fact.

In support of the siphoning factor, Benton and Rumisek cite Idbeis' 2006 payment of WSS's judgment against him using the proceeds from MASA's bank loan. MASA points out that Benton and Rumisek agreed before they left that MASA should bear this expense. But, Benton and Rumisek cite Idbeis' payment of a second portion of the judgment out of MASA's loan proceeds, and they take issue with the accounting practices Idbeis used to report these payments.

In support of the facade factor, Benton and Rumisek cite Idbeis' use of MASA funds and corporate facilities to conduct the business of a separate company Idbeis owns, Cardiovascular Hospitals of America. However, they do not cite any specific, post-2005 instances or events in this regard.

In support of the promoting injustice factor, Benton and Rumisek cite the creation of Cedar Surgical and the transfer of MASA's physical, financial, and personnel assets, including the Emprise loan proceeds, to Idbeis' new company in 2006. They argue that by this transaction, Idbeis is attempting to avoid MASA's Emprise loan obligation.

We express no opinion regarding the ultimate merit of this claim. Nevertheless, viewing the facts in the light most favorable to Benton and Rumisek, we are unable to declare as a matter of law that there is no genuine issue of material fact and that MASA and Idbeis are entitled to judgment on this claim. Summary judgment is not appropriate on this claim since it is predicated on disputed facts which must be resolved at trial.

### Conclusion

Based upon our de novo review, we summarize our conclusions as follows:

- Third-party defendants are entitled to judgment on Benton and Rumisek's claim for subrogation, but not on the theory advanced by third-party defendants in their cross-appeal.
- Benton and Rumisek are entitled to summary judgment on their claim for indemnification by MASA.
- Idbeis and Fleming are entitled to summary judgment on Benton and Rumisek's current claim for contribution.
- Idbeis is entitled to summary judgment on Benton's claim that Idbeis breached fiduciary duties.
- There remain genuine issues of material fact to be resolved at trial on Benton and Rumisek's claim that MASA is Idbeis' alter ego. The summary judgment entered in favor of MASA and Idbeis on this claim is set aside.

Affirmed in part, reversed in part, and remanded for trial.