# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37850-2010

PAUL MORRISON,          )
)      Boise, February 2012 Term
    Plaintiff-Appellant,    )
)      2012 Opinion No. 52
v.                     )
)      Filed: March 22, 2012
NORTHWEST NAZARENE UNIVERSITY,   )
)      Stephen W. Kenyon, Clerk
    Defendant-Respondent.    )
)

---

Appeal from the District Court of the Third Judicial District of the State of Idaho, in and for Canyon County. The Hon. Juneal C. Kerrick, District Judge.

The judgment of the district court is <u>affirmed</u>.

John C. Doubek; Doubek & Pyfer, LLP; Helena, Montana; argued for appellant.

John A. Bailey; Racine Olson Nye Budge & Bailey, Chtd; Pocatello; argued for respondent.

---

EISMANN, Justice.

This is an appeal challenging the district court's ruling on summary judgment that the plaintiff's action for personal injuries suffered when he fell from a climbing wall was barred by the hold harmless agreement he signed prior to engaging in that activity. We affirm the judgment of the district court.

## I.

## Factual Background.

As a team building exercise, Paul Morrison's employer wanted him and his coworkers to participate in a program at Northwest Nazarene University that included a climbing wall activity. Several days prior to doing so, Morrison's employer required him to sign an agreement prepared by the University holding it harmless from any loss or damage he might incur due to the University's negligence or that of its employees.

Morrison was severely injured when he fell while on the climbing wall. He filed this action alleging that his injuries were caused by the negligence of the University employees who were supervising the climbing wall activity. One of Morrison's coworkers was assigned to control the safety rope used to keep the wall climber from falling, and Morrison alleges that his fall was caused by the negligent failure of a University employee to train and supervise that coworker.

The University moved for summary judgment on the ground that Morrison's cause of action was barred by the hold harmless agreement. The district court agreed and dismissed this action. Morrison then timely appealed.

## II.

### Did the District Court Err in Failing to Invalidate the Hold Harmless Agreement Due to the Inequality in Bargaining Power?

"Freedom of contract is a fundamental concept underlying the law of contracts and is an essential element of the free enterprise system." *Rawlings v Layne & Bowler Pump Co.*, 93 Idaho 496, 499, 465 P.2d 107, 110 (1970). Agreements exempting a party from liability for negligence will be upheld unless the party owes to the other party a public duty created by statute or the other party is at an obvious disadvantage in bargaining power. *Lee v. Sun Valley Co.*, 107 Idaho 976, 978, 695 P.2d 361, 363 (1984).

In this case, there is no allegation of any public duty that the University owed to Morrison. However, he contends that there was an obvious disadvantage in bargaining power because his employer required that he sign the hold harmless agreement. The existence of unequal bargaining power is not, by itself, sufficient to relieve a party from the provisions of a hold harmless agreement. Rather, the party must be "compelled to submit to a provision relieving the other from liability for future negligence [because] . . . the party injured has little choice, as a practical matter, but to use the services offered by the party seeking exemption." 57A Am. Jur. 2d *Negligence* § 63 (2004). It is essentially the same test for determining whether unequal bargaining power between parties to a contract is sufficient to constitute procedural unconscionability. *See Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 42, 72 P.3d 877, 882 (2003) ("Lack of voluntariness can be shown . . . by great imbalance on the parties' bargaining power with the stronger party's terms being nonnegotiable and the weaker party

2

being prevented by market factors, timing, or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all.")

In this case, Morrison stated in his affidavit: "My said employer told us before we went to the team building exercises that I needed to sign the release in order to participate. All employees were expected to participate and I signed it." He also stated that he was not given the option of refusing to sign the release and it was required by his employer. Morrison was not injured by signing the release. He was injured by falling from the climbing wall. Absent from his affidavit is any statement that he told his employer that he did not want to climb the climbing wall and that his employer ordered him to do so anyway.[1]

"With respect to adult participants, the general rule is that releases from liability for injuries caused by negligent acts arising in the context of recreational activities are enforceable." 57A Am. Jur. 2d *Negligence* § 65 (2004). The agreement that Morrison signed stated as a separate paragraph: "The undersigned has read and voluntarily signs this release and waiver of liability and indemnity agreement. The undersigned further agrees that no oral representations, statements or inducements apart from the foregoing agreement have been made." Morrison has not demonstrated a genuine issue of material fact showing that there was an obvious disadvantage in bargaining power sufficient to relieve him of the provisions of the hold harmless agreement that he signed.

### III.

### Did the District Court Err in Ruling that the Hold Harmless Agreement Was Valid and that It Applied to the Cause of Action Alleged in the Complaint?

Morrison contends that the hold harmless agreement is invalid because it is overly broad and is ineffective to bar his claim because it does not clearly identify the conduct that caused his injuries. "Interpretation of unambiguous language in a contract is an issue of law." *McDevitt v. Sportsman's Warehouse, Inc.*, 151 Idaho 280, 283, 255 P.3d 1166, 1169 (2011).

The agreement is entitled "Release / Hold Harmless / Indemnity / Assumption of Risk Agreement," and it states as follows:

---

[1] We need not decide whether an employer's demand that an employee participate in a hazardous activity would be sufficient to void a hold harmless agreement between the employee and the third party that conducted such activity.

**Release:**  The undersigned, in consideration of being permitted to participate in the Northwest Nazarene University Challenge Course Adventure Program, for educational purposes does irrevocably, personally and for his or her heirs, assigns and legal representatives, release and waive any and all past, present or future claims, demands, and causes of action which the undersigned now has or may in the future have against Northwest Nazarene University, its members, directors, administrators, representatives, officers, agents, employees, and assigns, and each of them (hereinafter jointly and severally referred to as "Releasees"), for any and all past, present or future loss of or damage to property, and/or bodily injury, including death, however caused, resulting from, arising out of or in any way connected with his/her participation in or use of the Northwest Nazarene University Challenge Course Adventure Program.

**Hold Harmless/Indemnity:**  The undersigned agrees to defend, indemnify and hold harmless the Releasees and each of them from any loss, liability, damage or cost she/he might incur due to her/his participation in or use of the Northwest Nazarene University Challenge Course Adventure Program whether caused by the negligence of the Releasees or otherwise.  The undersigned further covenants not to cause any action at law or in equity to be brought or permit such to be brought in his or her behalf, either directly or indirectly, on account of loss or damage to property and/or bodily injury, including death, against the Releasees, resulting from, or arising out of, or in any way connected with any claims, demands, and causes of action which now or in the future may be asserted against the Releasees arising out of or by reason of said course described above, including any injury, loss or damage that might occur at any place in connection therewith.

**Assumption of Risk:**  The undersigned further states and affirms that he/she is aware of the fact that the aforesaid course, even under the safest conditions possible, may be hazardous, that he/she assumes the risks of any and all loss or of damage to property and/or bodily injury, including death, however caused, resulting out of or in any way connected with the Northwest Nazarene University Challenge Course Adventure Program; that he/she is of legal age and is competent to sign this Waiver of Claims and Release of Liability; and that he/she has read and understands all of the provisions herein contained.  Risks include but are not limited to the following:  [a list of various types of actions that can cause injury and various types of injuries].

Morrison contends that the hold harmless agreement is invalid because it is overbroad.  It exempts the University and "its members, directors, administrators, representatives, officers, agents, employees, and assigns, and each of them" from "any and all past, present or future claims, demands, and causes of action which the undersigned now has or may in the future have" for all "bodily injury, including death, however caused, resulting from, arising out of or in any way connected with his/her participation in or use of the Northwest Nazarene University

Challenge Course Adventure Program." It also specifically mentions negligence. The hold harmless agreement is not overbroad. It only applies to all causes of action "resulting from, arising out of or in any way connected with his/her participation in or use of the Northwest Nazarene University Challenge Course Adventure Program."[2] Due to the dangers inherent in climbing the climbing wall, the University can certainly require such a release from anyone choosing to engage in that activity.

The agreement is likewise not inapplicable because of its failure to mention the specific conduct that is alleged to have constituted negligence in this case. In *Anderson & Nafziger v. G. T. Newcomb, Inc.*, 100 Idaho 175, 178, 595 P.2d 709, 712 (1979), this Court stated, "Clauses which exclude liability must speak clearly and directly to the particular conduct of the defendant which caused the harm at issue." That language can be misinterpreted, because neither that case nor the cases it cited nor our subsequent cases have held that an exculpatory clause must list the specific, allegedly negligent conduct at issue.

The *Anderson & Nafziger* Court cited three cases as support for the statement. The first one was *Valley National Bank v. Tang*, 499 P.2d 991 (Ariz. Ct. App. 1972). In that case, the court stated "that clauses which purport to exclude liability for negligence must speak clearly and directly to the conduct at issue," *id*. at 994, which it explained as meaning that an exculpatory clause would not cover negligence unless the wording was broad enough to include future negligent conduct within its scope. It stated, "The principal reason for such a construction is to assure that there has been actual agreement between the parties that the defendant shall not be liable for the consequences of future conduct which would otherwise be negligent." *Id*. The second case was *Missouri Pac. R. Co. v. City of Topeka*, 518 P.2d 372 (Kan. 1974). The court held that a contract requiring a railroad to "save the said City of Topeka harmless from all costs, damages and expenses for the payment of which the said city may become liable to any person or persons or corporation by reason of the granting of said right of way to said railway company," *id*. at 375, was not broad enough to require the city to pay the railroad the cost of relocating its tracks due to an urban renewal project. The court stated, "As we view the 'hold harmless' clause, to which the railroad is deemed to have agreed, there is no suggestion it was intended to provide protection against liability for expenses, loss or damage created or made

---

[2] There is no contention that the conduct of the University employee was reckless or that the employee intentionally injured Morrison.

necessary by actions of the city-franchisor." *Id*. at 376. The third case was *Walker Bank & Trust Co. v. First Sec. Corp.*, 341 P.2d 944 (Utah 1959), in which the beneficiary of a life insurance policy sued a bank for damages because the policy had lapsed due to the bank's failure to charge the insured's account with drafts for the monthly premiums. The insured had signed an authorization to pay the drafts from her account, but the bank misplaced it. The authorization included a provision stating, "I understand and agree that your compliance herewith shall constitute a gratuity and courtesy accorded me as your customer, and that you assume or incur no liability whatsoever in the premises, and I further agree to hold you harmless of and from any and all claims arising hereunder." *Id*. at 947. The court held that the hold harmless agreement only barred claims resulting from the bank's "compliance herewith," not its failure to comply with the agreement. The court stated:

> It will be noted that the language quoted above purports only to protect the bank from liability arising from its *compliance* with the authorization, indicating that if it did so it would "incur no liability whatsoever." . . . But there is no provision that it would be protected in the event of entire failure to fulfill the arrangement.

*Id*. (emphasis theirs). None of the cases held that an exculpatory clause was ineffective because the specific conduct that gave rise to the cause of action was not listed.

In *Anderson & Nafziger*, the buyer contracted to purchase three pivots that the seller agreed to deliver and install in mid-May, and the buyer brought an action for damages when the seller failed to do so. The purchase contract included a provision limiting the seller's liability which stated as following:

> It is hereby understood and agreed that all work ordered hereunder is precarious and uncertain in its nature, and all pulling of pumps, reinstalling pumps, repair work, alterations, well work, sand pumping, corrections, or other work herein specified, etc., shall be strictly at the Purchaser's risk. The Seller will not be liable for damage of any kind, particularly including loss or damage for diminuation or failure of crop, shortage of water, inability or failure to supply same, or for diminuation or cessation of water flow; nor shall the Seller be liable for any damages or delays of any kind on account of sticking of pump in the well in any position, either when being pulled out or being reinstated nor shall the Seller be liable for any damages on account of delay in making repairs or installing by virtue of some defect in the well, or by virtue of the well not being in condition to receive the machinery, or by virtue of unforeseen or changing conditions in the well or in or about the premises on which the well is located.

6

*Anderson v. Nafziger,* 100 Idaho at 178, 595, P.2d at 712. This Court held that the clause did not preclude liability for crop loss caused by the failure to deliver the pivots because "[a] reading of the total clause indicates that the clause is aimed at limiting the seller's liability for crop loss which is caused by installation or repair work done by seller." *Id.* The clause listed specific types of conduct and causes of damage to which it applied. It did not have a general provision excluding liability for any delay in delivering or installing the equipment.

A review of this Court's other cases shows that the hold harmless agreement need not specify the exact conduct that was allegedly negligent or caused harm. In *H. J. Wood Co. v. Jevons*, 88 Idaho 377, 400 P.2d 287 (1965), a landowner had entered into a contract for the purchase and installation of an irrigation pump in her well. The sales contract included a hold harmless agreement stating as follows:

> Seller shall not be liable for damage or for consequential damage, particularly including loss or damage for diminution or failure of crops, shortage of water, or inability or failure to supply same, whether due to improper installation or performance of the machinery or otherwise . . . it being understood and agreed by Buyer that this work is uncertain and precarious in its nature.

*Id.* at 378, 400 P.2d at 289. The landowner sought damages, alleging that she suffered crop losses because "the pump never functioned properly," because the seller "removed the pump to make repairs and failed to provide appellant with a substitute pump," and because "in making repairs to said pump [the seller] carelessly and negligently lost the tail pipe of said pump in the well, causing an inadequate flow or supply of water during the irrigation season." *Id.* at 380, 400 P.2d at 288. The trial court sustained the seller's objection to any evidence of crop loss, and then dismissed the landowner's claim. On appeal, this Court held that it was not error to exclude evidence of crop loss because "[t]he foregoing quoted portion of the contract is unambiguous and clearly exempts respondent from liability for crop damage." *Id.* at 381, 400 P.2d at 289. There was nothing in the exculpatory clause specifying that the seller would not be liable for failing to provide the landowner with a substitute pump while hers was being repaired or for negligently losing the tail pipe in the well, both of which were conduct that she alleged caused her damage. In fact, the clause did not even include the word "negligence."

In *Rawlings v Layne & Bowler Pump Co.*, 93 Idaho 496, 465 P.2d 107 (1970), the landowner entered into a contract for the purchase and installation of irrigation pumping machinery. He later brought an action seeking damages on the ground that he suffered crop loss

7

because of the allegedly negligent installation of the pumping equipment. Paragraph 10 of the contract between the parties included an exculpatory clause stating:

> Seller or Holder shall not be liable for consequential damage particularly including loss or damage for diminution or failure of crops, shortage of water, or inability or failure to supply same, due to installation or performance of the property sold hereunder, or repair work, pump or well service, nor shall Seller be liable for collapsing, telescoping, separating or otherwise injuring the well or pump, for any cause whatsoever, including negligence, since the Buyer and Seller agree that the work is hazardous and precarious in its nature . . . .

*Id.* at 497, 465 P.2d at 108. The trial court dismissed the landowner's claim based upon the above contract provision, and the landowner appealed. In upholding the dismissal, we stated, "It is our opinion that the language contained in paragraph 10 of the contract is clear and unambiguous and its effect is to preclude the seller's liability for consequential damages such as are sought by the appellant." *Id*. at 499, 465 P.2d at 110. We did not require that the exculpatory clause mention the specific conduct that was allegedly negligent. In fact, the specific conduct that allegedly constituted negligent installation was not even identified in the opinion.

In *Steiner Corp. v. American District Telegraph*, 106 Idaho 787, 683 P.2d 435 (1984), the plaintiff contracted with the defendant to install and maintain a fire alarm system in the plaintiff's building. The system failed to detect a fire because the defendant had not checked the electrolyte levels in the system's batteries for eight months even though they were to be inspected monthly. The parties' contract included a provision stating that the defendant "shall be exempt from liability for loss or damage due directly or indirectly to occurrences, or consequences therefrom, which the service is designed to detect or avert," and that the exculpatory clause applied if the loss or damage "results directly or indirectly to person or property from performance or nonperformance of obligations imposed by this contract or from negligence, active or otherwise, of the [defendant], its agents or employees." *Id*. at 789, 683 P.2d at 437. The plaintiff sued for strict liability, breach of warranty, and negligence. This Court first held that the complaint did not allege a cause of action under those theories, but then stated that even if the plaintiff could allege a cause of action it was barred by the exculpatory clause. *Id*. at 791, 683 P.2d at 439. We stated, "This unambiguous clause was clearly intended to apply to exclude liability under any of the bases urged by Steiner." *Id*. The clause did not specifically mention the failure to inspect or maintain the batteries.

8

In *Lee v. Sun Valley Co.*, 107 Idaho 976, 695 P.2d 361 (1984), the plaintiff, prior to going on a trail ride, signed a rental agreement that included an exculpatory clause stating:

> Upon my acceptance of horse and equipment, I acknowledge that I assume full responsibility for my safety. I further understand that I ride at my own risk, and I agree to hold the above entity, its officers, employees, etc., harmless from every and all claim which may arise from injury, which might occur from use of said horse and/or equipment, in favor of myself, my heirs, representatives or dependents. I understand that the stable does not represent or warrant the quality or character of the horse furnished.

*Id*. at 977, 695 P.2d at 362. Prior to the plaintiff mounting his horse, the defendant's employee adjusted the cinch on the saddle. During the ride, the saddle loosened, and the plaintiff was injured when it rotated and the horse reared as he was attempting to dismount. We upheld the dismissal of the plaintiff's claim on the ground that it was barred by the exculpatory clause, stating, "The agreement clearly and simply states that Sun Valley should be held 'harmless for every and all claim which may arise from injury, which might occur from use of said horse and/or equipment,' which is both unambiguous and applicable to the facts alleged by plaintiff." *Id*. at 978, 695 P.2d at 363. The exculpatory clause did not even mention negligence, nor did it specifically list the failure to properly adjust the cinch as being within its scope. Justice Bistline dissented for that very reason. *Id*. at 981, 695 P.2d at 366.

Finally, in *Empire Lumber Co v Thermal-Dynamic Towers, Inc*., 132 Idaho 295, 971 P.2d 1119 (1998), a warehouse lease contained a provision stating, "Except for reasonable wear and tear and damage by fire or unavoidable casualty, Lessee will at all times preserve said premises in as good repair as they now are or may hereafter be put to . . . ." *Id.* at 297, 971, P.2d at 1121. We held that the clause did not exempt the lessee from liability for fire damage caused by the lessee's negligence, stating, "The lease language does not clearly indicate, as required by this Court's decision in *Anderson & Nafziger*, that the parties intended to release TDT from liability for its negligent acts." *Id*. at 300, 971 P.2d at 1124. The clause made no mention of negligence, nor could its language be construed to apply to negligence. Hold harmless agreements are strictly construed against the person relying upon them. *Anderson & Nafziger*, 100 Idaho at 178, 595 P.2d at 712.

The decisions of this Court have not held that a hold harmless agreement must describe the specific conduct or omission that is alleged to be negligent in order for it to bar recovery. That is consistent with the general law. "The parties to a release need not have contemplated the

9

precise occurrence that caused the plaintiff's injuries but rather may adopt language to cover a broad range of accidents by specifying injuries involving negligence on the part of the defendant."  57A Am. Jur. 2d *Negligence* § 53 (2004).  In this case, the agreement stated that Morrison held the University harmless "from any loss, liability, damage or cost she/he might incur due to her/his participation in or use of the Northwest Nazarene University Challenge Course Adventure Program whether caused by the negligence of the Releasees or otherwise."  That language clearly stated that the clause applied to negligence and to any loss or damage he might incur from his participation in the program.  The district court did not err in dismissing his negligence claim because it was barred by the hold harmless agreement.

## IV.

### Is the Defendant Entitled to an Award of Attorney Fees?

In its issues on appeal, the University states that it "requests attorney fees on appeal pursuant to Idaho Code § 12-120(3), Idaho Code § 12-121, and/or Idaho Rule of Civil Procedure 54(e)(1)."  However, it did not again mention attorney fees until it states in the conclusion section of its brief, "Respondent further requests an award of attorney fees on appeal pursuant to Idaho Code § 12-120 (3), Idaho Code § 12-121, and/or I.R.C.P Rule 54(e)(1)."  As we held in *Weaver v. Searle Brothers*, 129 Idaho 497, 503, 927 P.2d 887, 893 (1996), where a party requests attorney fees on appeal but does not address the issue in the argument section of the party's brief, we will not address the issue because the party has failed to comply with Idaho Appellate Rule 35.

## V.

### Conclusion.

We affirm the judgment of the district court.  We award the respondent costs, but not attorney fees, on appeal.

Chief Justice BURDICK, Justices W. JONES, and HORTON **CONCUR.**

10

J. JONES, J., concurring in part and dissenting in part.

I concur in Part II of the Court's opinion but dissent with respect to Part III. In my view, the Release/Hold Harmless/Indemnity/Assumption of Risk Agreement (Agreement) does not contain language effective to release Northwest Nazarene University (NNU) from liability for its own negligent actions; the release language in the Agreement is overly broad; and it would be contrary to public policy to provide immunity under the particular facts of this case.

Although this Court disfavors contracts purporting to absolve parties from certain duties and liabilities, contracting parties are free to enter into such agreements if they comply with strict criteria. As this Court summarized in *Jesse v. Lindsley*, 149 Idaho 70, 75, 233 P.3d 1, 6 (2008):

> Freedom of contract is a fundamental concept underlying the law of contracts. *Rawlings v. Layne & Bowler Pump Co.*, 93 Idaho 496, 499, 465 P.2d 107, 110 (1970). A contracting party may absolve himself from certain duties and liabilities under the contract, subject to certain limitations. *Anderson & Nafziger v. G.T. Newcomb, Inc.*, 100 Idaho 175, 178, 595 P.2d 709, 712 (1979). However, courts look with disfavor on such attempts to avoid liability and construe such provisions strictly against the person relying on them, especially when that person is the preparer of the document. *Id.* Clauses which exclude liability must speak clearly and directly to the particular conduct of the defendant which caused the harm at issue. *Id.*

Where a party seeks to obtain contractual absolution from the consequences of that party's own negligence, the release language must be particularly clear. As stated in 57A American Jurisprudence, 2d *Negligence* § 52 (2004):

> Because the law does not favor contract provisions that relieve a person from his or her own negligence, and such provisions are subject to close judicial scrutiny, a greater degree of clarity is required to make such provisions effective. The exculpatory provision must be expressed in clear, explicit, and unequivocal language showing that this was the intent of the parties. The wording of such an agreement must be so clear and understandable that an ordinarily prudent and knowledgeable party to it will know what he or she is contracting away; it must be unmistakable.

American Jurisprudence continues the discussion in section 53:

> To be effective, the intentions of the parties with regard to an exculpatory provision in a contract should be delineated with the greatest of particularity, and the clause must effectively notify the releasor that he or she is releasing the other person from claims arising from that person's own negligence.

> An exculpatory clause will be given effect if the agreement clearly and unambiguously expresses the parties' intention to exonerate by using the word

11

"negligence" and specifically including injuries definitely described as to time, place, and the like. Thus, the better practice is to expressly state the word "negligence" somewhere in the exculpatory provision. However, a specific reference to the "negligence" of the maker of the clause or agreement is not required if the clause clearly and specifically indicates an intent to release the defendant from liability for a personal injury caused by the defendant's negligence, if protection against negligence is the only reasonable construction, or if the hazard experienced was clearly within the contemplation of the provision. However, words conveying a similar import must appear; the provision must specifically and explicitly refer to the negligence of the party seeking a release from liability. A preinjury release will not cover negligence if it neither specifically enumerates negligence, nor contains any other language that could relate to negligence.

A general release will not bar claims outside the parties' contemplation at the time it was executed. For example, a claim for negligence will not be barred by using broad and sweeping language, as by an agreement to release from "any and all responsibility or liability of any nature whatsoever for any loss of property or personal injury occurring on this trip." Thus, an exculpatory clause must clearly set out the negligence for which liability is to be avoided.

The parties to a release need not have contemplated the precise occurrence that caused the plaintiff's injuries but rather may adopt language to cover a broad range of accidents by specifying injuries involving negligence on the part of the defendant.

*Id.* § 53.

The Agreement addresses four subjects—release, hold harmless, indemnity, and assumption of risk. The first paragraph of the Agreement, entitled "Release," is a general release of liability,[3] whereby participants in NNU's Challenge Course Adventure Program (Program) release and waive claims against NNU and its agents and employees for property damage or bodily injury arising out of the Program. The word "negligence" does not appear anywhere in the Release. The second paragraph of the Agreement is a hold harmless/indemnity provision,[4] whereby the participant "agrees to defend, indemnify and hold harmless" NNU and its agents and employees from liability incurred due to participation in the Program "whether caused by the negligence of the Releasees or otherwise." Thus, the participant is obligated to defend and hold

---

[3] According to Black's Law Dictionary, a "release" is "[t]he relinquishment or concession of a right, title, or claim." Black's Law Dictionary 1403 (9th ed. 2009).

[4] According to Black's, a "hold-harmless clause" is synonymous with an "indemnity clause," which is "[a] contractual provision in which one party agrees to answer for any specified or unspecified liability or harm that the other party might incur." *Id.* at 800, 837−38.

12

harmless the releasees against claims arising out of his or her participation in the Program. This paragraph specifically includes indemnity for claims alleging negligence on the part of NNU and its agents and employees. The last paragraph deals with assumption of risk,[5] stating that the participant is aware that the course may be hazardous and that participants assume the risk of property damage and bodily injury. However, as with the Release, this paragraph makes no mention of negligence on the part of NNU and its agents and employees.

It is significant that only the hold harmless/indemnity paragraph of the Agreement includes a provision relating to the negligence of NNU. The word "negligence" appears nowhere else in the Agreement, particularly not in the Release nor in the assumption of risk paragraph. It is important to keep in mind that a hold harmless/indemnity clause does not operate as a bar to a claim in the same way as a "release" or "assumption of risk" clause might. So, where the party seeking immunity faces the double whammy of our construction principles—construing release provisions strictly against the person relying on them and requiring such provisions to speak clearly and directly to the particular instrumentality that caused the harm—I simply cannot find that the release language here is sufficient to waive Morrison's claim. NNU could have included a provision in the Release absolving it and its agents and employees from liability, but it did not. It could have done likewise in the assumption of risk paragraph, but it did not. Where such language is specifically included in one paragraph dealing with specific subject matter and not in the other paragraphs, both of which deal with other specific subject matter, I think we ought to give weight to that fact, particularly when required to construe such agreements against the avoidance of liability.

Therefore, in my view, the release paragraph of the Agreement is insufficient to immunize against claims asserting injury for negligent acts by NNU and its agents and employees. In my estimation, NNU had a duty to operate the program in a non-negligent manner and Morrison has asserted sufficient facts to survive summary judgment as to whether NNU breached such duty. Morrison claims that he was not properly instructed on how to scale down the climbing wall and that the person holding the rope, which is apparently designed to keep a

---

[5] According to Black's, "assumption of the risk" is "[t]he principle that one who takes on the risk of loss, injury, or damage cannot maintain an action against a party that causes the loss, injury, or damage." *Id*. at 143. Although implied assumption of the risk has been abolished as a defense in Idaho, this Court still recognizes that *express* assumption of risk may preclude a negligence claim. *Salinas v. Vierstra*, 107 Idaho 984, 989−90, 695 P.2d 369, 374−75 (1985).

13

participant from falling, was not properly instructed and supervised in performing that task. According to Morrison:

> I had very little knowledge of climbing before [the accident]. I trusted and relied that the people running the course would properly instruct me and the people who were holding the rope that allowed me to scale down the wall. I do not believe that they gave me nor Donna Robbins, who was holding my rope, adequate instruction before this event nor do I believe that they adequately supervised Donna in properly handling the rope while I descended the wall.

The person holding the rope, Donna Robbins, agreed that she had not been properly instructed nor supervised. According to her affidavit, "I did feel that I had not been given adequate training to act as the belayer and I felt that I was neglected by the employees at the Rope Course when I was needing help." In her statement made immediately after the accident, which was incorporated into her affidavit, she expanded:

> The female assistant on site asked me to balet [sic] if I wasn't going to climb the wall. I wasn't comfortable working the equipment but I knew I should be a part of the team and help [belay]. I remember feeling like I was thrown in there and did not receive any further instruction other than where to hold my hands. After she strapped me in I was good to go. Soon she realized I was having trouble knowing what to do and informed me that I needed to pull the rope tight and slide the extra rope through my other hand to make it tight. She then placed another girl to my right and instructed her to coil the rope. I was the only one baleting [sic] and had one girl to my right holding the extra rope. As soon as they pulled the [ladder] away and Paul started climbing, I began to have trouble with the rope. The assistant assured me I was strapped down to the pole behind me and that I needed to walk forward away from the pole until I felt it was tight enough to not leave any slack. As soon as Paul reached the middle of the wall, his legs began to get tired and he would rest a little. But every time he would stop to rest, the rope pulled me into the air and the others around were laughing and joking around about the [sight] of me and my feet being off the ground and my body being pulled into the air. At first, it was comical but I felt like I couldn't control him. I knew he had to keep climbing or else this strain on me would begin to hurt. So I just cheered him on. I looked around and everyone was just smiling so I figured I wasn't going anywhere and there was nothing to worry about. Paul looked down and looked a little worried. He asked me if I was ok. I said yes. When Paul finally got to the top, he rang the bell and was ready to let go. When he did, if felt like an extreme pull on me and the assistant came quickly to briefly explain what to do. She told me to hold onto the [brake] (that also releases the rope). I think she thought she was explaining it to me−but she wasn't. I told her I didn't know how to use it. She said "its really easy," just make sure you pull down the level." She was walking away from me as she was saying this and she seemed very busy with other people. I didn't think it would be too difficult. As I pulled the lever, Paul began to come down fast and I honestly don't remember what I was thinking. I

tried to grab the rope but it just stung my fingers and I knew I couldn't stop it that way. I kept trying to figure it out quickly. The girl to my right was helpless as well. The rope was just flying out her hands. I looked up and Paul's feet, then butt, hit the rocks very fast and head hit very hard on the wooden frame around the rocks.

My feeling throughout the rock-climbing activity was that I was alone and assigned to do it because I had to. I wasn't comfortable at all but the assistant felt I was well taken care of. Even though I didn't answer her twice when she asked for volunteers, so she called me out and handed me the [belay]. But I did want to be a part of the team and help but had never done it before and was pretty intimidated.

Even if we were permitted to import the specific reference to negligent conduct from the hold harmless/indemnity paragraph into the Release, that paragraph suffers from another infirmity. It is overly broad. It purports to release NNU and its agents and employees from any claims for property damage or bodily injury "however caused, resulting from, or arising out of or in any way connected with his/her participation in or use of the Northwest Nazarene University Challenge Course Adventure Program." The sweeping nature of the provision runs afoul of the specificity requirements noted in sections 52 and 53 of American Jurisprudence. This Court has found a similar all-encompassing provision in a lease agreement to be overly broad. In *Jesse v. Lindsley*, we dealt with an exculpatory clause that attempted "to relieve the landlord of liability for any type of injury, wherever it may occur." 149 Idaho at 76, 233 P.3d at 7. We held, "The clause is too broad and does not speak clearly and directly to the particular conduct of the defendant intended to be immunized," citing *Anderson & Nafziger*, 100 Idaho 175, 178, 595 P.2d, 709, 712 (1970). We stated:

> While we have not considered the question of the enforceability of an overbroad exculpatory clause, we have considered the issue of enforceability of an overbroad contract provision in another area where a contractual provision is disfavored and strictly construed—covenants not to compete in contracts of employment. *See Freiburger v. J-U-B Engineers, Inc.*, 141 Idaho 415, 420, 111 P.3d 100, 105 (2005). A covenant not to compete is reasonable and enforceable only if the covenant "(1) is not greater than necessary to protect the employer in some legitimate business interest; (2) is not unduly harsh or oppressive to the employee; and (3) is not injurious to the public." *Id.* Applying the same principle here, it appears that the language absolving Lindsley of any liability for any occurrence anywhere on his property is simply too broad.

*Id.* at 76−77, 233 P.3d at 7−8.

In its opinion, the Court nicely summarizes some of our pre-*Jesse* cases regarding the degree of specificity required in a lease provision, and in my view none of those cases preclude the result I suggest here. In *Lee v. Sun Valley Co.*, 107 Idaho 976, 695 P.2d 361 (1984), the plaintiff was injured when the saddle on a rented horse slipped, causing the horse to buck. *Id.* at 977, 695 P.2d at 362. The Court found that the plaintiff's action was precluded by an agreement he signed acknowledging that he assumed the risk of riding and holding the defendant "harmless from every and all claim which may arise from injury, which might occur from use of said horse and/or equipment." *Id.* Although the Court articulated little reasoning for its holding, a fall from a horse due to a loose saddle is a danger inherent in horseback riding itself. Thus, the agreement's language was sufficient to put the plaintiff on notice of that risk. Of interest, however, is that the release specifically identified the "equipment" as a potential source of injury, which is not the case here.[6] In *H. J. Wood Co. v. Jevons*, the Court evaluated a sales contract for an irrigation pump stating the seller "shall not be liable for damage or for consequential damage, particularly including loss or damage for diminution or failure of crops … whether due to improper installation or performance of the machinery or otherwise." 88 Idaho 377, 378, 400 P.2d 287, 289 (1965). The plaintiff's claims for crop loss in that case all stemmed from the allegation that "the pump never functioned properly" and the consequences of that malfunction, which is clearly and directly contemplated by the "performance of the machinery" language in the agreement. *See id.* Thus, the Court correctly applied the rule.

Another irrigation equipment contract case, *Rawlings v. Layne & Bowler Pump Co.*, was similar. 93 Idaho 496, 465 P.2d 107 (1970). There, the claim for crop loss was based on negligent

---

[6] In this regard, a case cited in section 53 of American Jurisprudence is relevant. In *Beardslee v. Blomberg*, 70 A.D.2d 732, 733 (N.Y. App. Div. 1979), a spectator at a stock car race volunteered to take part in a "Powder Puff Derby," a stock car race for women. When the spectator's car struck a retaining wall of the race track, she alleged the defendant raceway was negligent in "providing her with an unsafe vehicle, a defective helmet, and in failing to supply her with a fire suit." *Id.* The defendant relied on a release she had signed to bar her claim (the language of which is not entirely quoted in the opinion), but the New York Supreme Court, Appellate Division, stated:

> The release absolves the defendants from liability for any injury plaintiff might sustain while in the "restricted area", which includes the race track proper. It does not, however, specifically refer to equipment furnished by the defendants. Releases from liability for negligence are closely scrutinized and strictly construed, and a release general in its terms will not bar claims outside the parties' contemplation at the time it was executed …. Furthermore, since the release herein is not entirely free of ambiguity, an issue of fact exists as to whether the risk of faulty equipment or the failure to furnish essential equipment was within the contemplation of the parties at the time it was executed ….

*Id.*

installation of pumping equipment, and the Court barred the claim based on an agreement exculpating the seller from liability for consequential damage "due to installation … of the property sold hereunder." *Id.* at 497, 465 P.2d at 108.[7] Although the particular negligent conduct was not addressed, further specificity was not necessary to put the buyer on reasonable notice of the claim he was waiving. *Id.* Buying any item under a contract specifically limiting liability for defects in installation clearly brings to mind the discrete array of possible installation-related conduct that entails. Such a contract does far more to notify the signer than simply including blanket language barring liability for any type of negligent conduct imaginable.

Similarly, in *Steiner Corp. v. American District Telegraph*, the defendant contracted with the plaintiff to perform two discrete services—to install and maintain a fire detection system. 106 Idaho 787, 683 P.2d 435 (1984). When the defendant failed to check the batteries of the system for eight months, the system failed to detect a fire in the plaintiff's building. Again, the Court found that such negligence fell under an exculpatory clause holding the defendant harmless for "loss or damage due … to occurrences … which the service is designed to detect or avert" resulting from "performance or nonperformance of obligations imposed by this contract or from negligence" of the defendant. *Id.* at 789, 683 P.2d at 437. This agreement specifically spoke to the alleged conduct by expressly referring to the discrete duties under the contract—to install and maintain. In signing the agreement, the plaintiff undoubtedly understood he was giving up claims for fire damage arising from failure to maintain the system, which reasonably included checking the batteries.

Conversely, in *Anderson & Nafziger*, the Court refused to find that a sales agreement for irrigation pivots contemplated liability for crop loss caused by delay in delivering the pivots, based on a strict reading of the agreement's language. 100 Idaho at 178, 595 P.2d at 712. Although the agreement contained blanket language stating that "[t]he Seller will not be liable for damage of any kind, particularly including loss or damage for diminuation [sic] or failure of crop," the Court held that the agreement did not apply. *Id.* The Court stated, "A reading of the total clause indicates that the clause is aimed at limiting the seller's liability for crop loss which is caused by installation or repair work done by seller." *Id.* With a loose reading, the Court might have found that the blanket language exempting liability "for damage of any kind" extended not only to that caused by

---

[7] The contract later specifically identified negligence of the seller as a possible cause. *Id.*

installation and repair, but also by delay in delivery. However, the Court declined such a broad reading, focusing strictly on the language in the contract.[8]

The upshot of these pre-*Jesse* cases is that where the dangers or risks inherent in a particular undertaking are, or should be, apparent to a reasonable person and where the release agreement employs clear and direct language to negate liability for such risks or dangers, the release will be effective to shield the releasee from liability. On the other hand, where a reasonable releasor cannot be expected to comprehend the risk or danger that results in injury and where the release does not contain language that speaks directly to limitation of liability for injury caused by such risk or danger, the release will not be enforced.

In the situation at hand, it cannot be said that the danger of falling from the rock wall was not readily apparent to any reasonable person. Morrison would surely have known that he could lose his grip or footing and fall. However, the activity involved a danger that was not so readily apparent. This activity involved equipment and a procedure that may have appeared on the surface to alleviate or eliminate the risk. The belaying rope, like a trapeze artist's safety net, was there, apparently to protect participants from the danger of a fall. This certainly would give a participant a certain measure of comfort and well being—knowing that the element of danger might well be alleviated or eliminated by the safety equipment. It is one thing to expose a participant to the "dangers inherent" in a particular activity and ask him to waive a consequent claim for damages, but it is quite another to give the participant the illusion of protective measures−thereby providing a false sense of security—and then fail to properly implement those protective measures. It is akin to a bait and switch. If protective measures are carried out in a competent manner, then an accident occurring in the course of the proceedings cannot be held against the sponsor. However, if those protective measures are inherently inadequate, by reliance on untutored or incapable personnel in their handling, the sponsors should not be shielded from responsibility by a waiver signed by an unwitting participant.

It makes sense to encourage sponsors of risky activities to adopt safety measures designed

---

[8] Another case, *Empire Lumber Co. v. Thermal-Dynamic Towers, Inc.*, also shows the Court taking a closer look at an exculpatory clause, although the result there was more obvious. 132 Idaho 295, 971 P.2d 1119 (1998). In *Empire Lumber*, a lessee sought to apply a lease provision to excuse its liability for a fire allegedly caused by its negligence. *Id.* The Court disagreed because the lease merely stated, "Except for reasonable wear and tear and damage by fire or unavoidable casualty, Lessee will at all times preserve said premises in as good repair as they now are or may hereafter be put to …." *Id.* at 297, 971 P.2d at 1121. As the Court properly found, that clause clearly only contemplated incidental or unavoidable damage—not negligence. *Id.*

to alleviate or eliminate the risk to participants. It is not particularly good policy, however, to allow sponsors to escape liability when those safety measures are handled in an incompetent or negligent manner, unless participants are clearly put on notice that safety measures or equipment may not provide the margin of safety that one might reasonably anticipate. Nothing in the Release here indicates the employment of "equipment," as the language in *Lee* did, nor of the possibility that any safety equipment might be operated in a faulty manner. Sponsors should be encouraged to adopt safety measures, but they should be held accountable where those measures are performed in a negligent fashion.

In the past, this Court has not been reluctant to embrace concepts of this nature, designed to provide redress where it may not have been previously available. For instance, the Court has adopted the doctrine that, "[e]ven when an affirmative duty generally is not present, a legal duty may arise if 'one voluntarily undertakes to perform an act, having no prior duty to do so.'" *Baccus v. Ameripride Services, Inc.*, 145 Idaho 346, 350, 179 P.3d 309, 313 (2008). "In such case, the duty is to perform the voluntarily-undertaken act in a non-negligent manner." *Id.* As with a voluntarily assumed duty, it makes good sense and policy to require that an activity sponsor who purports to make a risky activity safe, by the apparent incorporation of protective measures, be required to ensure the protective measures are carried out in a non-negligent manner or provide specific warning to participants that a risk of negligence in that regard inheres in the activity.[9]

For all or any one of the foregoing reasons, I would vacate the judgment of the district court on the ground that the Agreement was ineffective to shield NNU from liability for Morrison's claim. I would therefore remand for further proceedings.

---

[9] As we have noted on a number of occasions, "Public policy may be found and set forth in the statutes, judicial decisions or the constitution." *Jesse v. Lindsley*, 149 Idaho at 75, 233 P.3d at 6 (quoting *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 189, 108 P.3d 332, 336 (2005)).

19